[Cite as *Lang v. Weiss Drilling Co.*, 2016-Ohio-8213.]

STATE OF OHIO, MONROE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| JOSEPH AND ANNA LANG, | ) | |
| | ) | |
| PLAINTIFFS-APPELLEES, | ) | |
| | ) | CASE NOS. 15 MO 0005 |
| V. | ) | 15 MO 0006 |
| | ) | |
| WEISS DRILLING COMPANY, ET AL., | ) | OPINION |
| | ) | |
| DEFENDANTS-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:          Civil Appeal from Court of Common
                                   Pleas of Monroe County, Ohio
                                   Case No. 2013-389

JUDGMENT:                          Affirmed

APPEARANCES:
For Plaintiffs-Appellees            Attorney Ethan Vessels
                                   309 Second Street
                                   Marietta, Ohio 45750

For Defendants-Appellants           Attorney Jeffrey J. Rokisky
                                   3200 Main Street
                                   Weirton, WV 26062

                                   Attorney J. Kevin West
                                   Attorney Lyle B. Brown
                                   Attorney Melanie Morgan Norris
                                   41 South High Street, Suite 2200
                                   Columbus, Ohio 43215

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Carol Ann Robb

                                   Dated: December 19, 2016

DONOFRIO, P.J.

{¶1} Defendant-appellant, Antero Resources Corporation, along with defendant-appellant, Weiss Drilling Company, appeal from a Monroe County Common Pleas Court judgment declaring that a certain oil and gas lease has expired by its own terms due to a lack of production in paying quantities.

{¶2} Plaintiffs-appellees, Joseph and Anna Lang, own a 29.315 acre tract of land in Malaga Township in Monroe County. The Langs' property is part of a larger 32.5 acre tract originally purchased by Donald and Eileen Miller in 1962. In 1978, the Millers entered into an oil and gas lease with Gerald L. Weiss d.b.a. Gerald L. Weiss Drilling Company for the entire 32.5 acres (the Lease). The Millers sold most of the property, retaining just a small portion of the land where their home is located. The Langs purchased 4.33 acres of the property in 2007, and an additional 25.85 acres in 2011.

{¶3} The original lessee, Gerald Weiss, drilled a single well on the property called the Donald Miller No. 1 Well (the Well) in 1981, pursuant to the terms of the Lease. When Gerald Weiss passed away, his interest passed to his sons, Larry and Daniel Weiss. On March 2, 1989, Larry and Daniel formed appellant Weiss Drilling Company (Weiss). Larry and Daniel then assigned the Lease to Weiss on May 18, 1989. On September 28, 2012, Weiss assigned certain deep rights with respect to the Lease to appellant Antero Resources Corporation (Antero).

{¶4} On October 16, 2013, the Langs filed a complaint seeking a declaratory judgment that the Lease had expired due to the lack of sufficient production. The Lease provides that it is for a term "of 3 years from this date [January 10, 1978], and so much longer as Oil or Gas can be produced in paying quantities, or rent or royalty is paid." The Langs alleged the Well was not connected to a metering system for over 25 years, so any royalty payments were not based on actual production. They asserted that prior to 2008, the Well was only metered at an aggregate meter and was not metered to measure the production of the Well individually. The Langs further asserted that the Well did not produce oil or gas for several years, and therefore, the Lease expired by its own terms.

**{¶5}** The parties stipulated that since the Well was drilled, it has provided free gas to the Millers' residence. They also stipulated that prior to November 2007, the Well shared a common meter with anywhere from two to five others wells. In November 2007, a deduct meter was placed on the Well to measure its individual production.

**{¶6}** The matter proceeded to a bench trial. The court noted that Weiss admitted the Well never produced any oil for sale. Therefore, it stated the issue was whether the Well produced sufficient gas to keep the Lease active. The court found that prior to 2008, the Well's reported production, if any, was an estimate at best. It found that Daniel Weiss acknowledged that he did not regularly pay accurate royalties to the lessors. In fact, Weiss improperly sent payments to the Langs in 2005 and 2006, times when there was undisputedly no production by the Well. The court further found that Weiss reported losses to the IRS in 2005, 2006, and 2007. And it found that Weiss admitted the Well was unprofitable in 2003 and 2004. It further found that on more than one occasion, Daniel Weiss admitted to making comments that the Well was a bad well and a money loser. Finally, the court found that Daniel Weiss openly acknowledged his motive in this case was to hold onto the Lease for the potential benefit of speculating on future shale production.

**{¶7}** Based on the above, the trial court declared that the Lease was canceled for lack of production in paying quantities. It therefore entered judgment in favor of the Langs.

**{¶8}** Antero filed a timely notice of appeal on March 19, 2015. Weiss filed a timely notice of appeal the same day. On Antero's motion, this court consolidated the two appeals. Antero raises five assignments of error. Weiss raises two assignments of error. Because Weiss's assignments of error coincide with Antero's assignments of error, we will address them together.

**{¶9}** This case was tried to the trial court. All of the assignments of error assert that the court, in some way, did not give proper weight to certain evidence. Therefore, the civil manifest weight standard of review applies to the assignments of

error.

**{¶10}** The civil manifest weight of the evidence standard provides that judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus. The reviewing court is obliged to presume that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273 (1984). This presumption arises in part because the fact-finder occupies the best position to watch the witnesses and observe their demeanor, gestures and voice inflections and to utilize these observations in weighing credibility. *Id.* at 80. A reviewing court should not reverse a decision simply because its opinion differs from the finder of fact's opinion concerning the credibility of the witnesses and evidence submitted. *Id.* at 81. "A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Id.*

**{¶11}** Antero's first assignment of error states:

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FAILED TO APPLY THE DOCTRINE OF TEMPORARY CESSATION.

**{¶12}** Likewise, Weiss's second assignment of error states:

THE TRIAL COURT ERRED IN CONCLUDING THAT THE TEMPORARY CESSATION OF PRODUCTION WHICH WAS DUE TO THE MALFUNCTIONING OF THE WELL'S PUMP CONSTITUTED A LACK OF PRODUCTION FOR A TIME PERIOD SUFFICIENT TO TERMINATE THE SUBJECT LEASE.

**{¶13}** Antero and Weiss argue the trial court erred in failing to apply the doctrine of temporary cessation for the period of non-production of the Well. They assert they put forth evidence of a malfunctioning well pump, which would have

accounted for some of the period of non-production.

{¶14} Antero states that the pump malfunctioned in 2005 and was repaired in 2006. It points out that it offered testimony as to Weiss's reasonable diligence in getting the pump repaired. It notes that Weiss first attempted to fix the pump using various above-ground techniques. When those techniques did not work, Weiss contacted various contractors to perform below-ground repairs. The contractors were scheduled up to 24 months ahead with other repairs. It was not until June 2006 that one of the contractors was able to work on the Well. It then took Weiss several months to get the accumulated water out of the Well. Antero argues this evidence demonstrated that the period of non-production was attributable to the malfunction of the pump and Weiss used reasonable diligence to return the Well to production. Additionally, it argues that while Weiss acknowledged minimal production in 2003 and 2004, in hindsight this was likely attributable to the pump beginning to malfunction.

{¶15} After the primary term of an oil and gas lease expires, if the conditions of the secondary term are not being met, then the lease terminates by the express terms of the contract and by operation of law and revests the leased estate in the lessor. *Swallie v. Rousenberg*, 190 Ohio App.3d 473, 2010-Ohio-4573, 942 N.E.2d 1109 (7th Dist.), ¶ 63. It is common for the secondary term of the lease to be conditioned upon oil or gas being produced in paying quantities. *Dennison Bridge, Inc. v. Resource Energy, L.L.C.*, 7th Dist. No. 14 HA 21, 2015-Ohio-4736, ¶ 21. But the temporary cessation of production in paying quantities will not cause the lease to terminate under the habendum clause where the lessee uses reasonable diligence and good faith in attempting to resume production. *Id.* at ¶ 22.

{¶16} In *RHDK Oil & Gas, L.L.C. v. Dye*, 7th Dist. No. 14 HA 0019, 2016-Ohio-4654, this court considered three periods of non-production, none of which lasted longer than six months. We pointed out that no Ohio case could be found that deemed a lease forfeited based on less than two years of nonproduction. *Id.* at ¶ 22. We found that absent a finding of unreasonableness, a six-month cessation period is

temporary and does not terminate a lease. *Id.* at ¶ 24. We declined to adopt a bright-line rule as to when a nonproduction period terminates a lease. *Id.* at ¶ 24. But other appellate districts have held that a lease expires when there is no oil or gas produced for two years or more. *Schultheiss v. Heinrich Ents. Inc.*, 4th Dist. No. 15CA20, 2016-Ohio-121, ¶ 19, reconsideration granted in part (Mar. 11, 2016), appeal not allowed, 146 Ohio St.3d 1431, 2016-Ohio-4606, 52 N.E.3d 1205, ¶ 19, reconsideration granted, 146 Ohio St.3d 1494, 2016-Ohio-5585, 57 N.E.3d 1172, and appeal allowed, 146 Ohio St.3d 1494, 2016-Ohio-5585, 57 N.E.3d 1172; ; *Wagner v. Smith*, 8 Ohio App.3d 90, 94, 456 N.E.2d 523 (5th Dist.1982).

**{¶17}** In this case, the trial court found that the Well failed to produce in paying quantities in 2003, 2004, 2005, 2006, and 2007. The court found it significant that the Well did not produce in paying quantities in 2007, because this was after repairs were made on the pump. Thus, it found the Well failed to produce in paying quantities for at least five straight years. The court also found that the Well reported losses in 1983, 1984, 1985, 1986, and 1987. Moreover, the court found Weiss did not pay accurate royalties. And in 2005 and 2006, Weiss improperly paid royalties because there was no reported or actual production from the Well.

**{¶18}** The evidence supports the court's findings and judgment. The evidence was as follows.

**{¶19}** Daniel Weiss is Weiss's vice president and secretary. Daniel is also the person responsible for maintaining the Well.

**{¶20}** Daniel testified that he reported zero production to the Ohio State Department of Natural Resources from the Well in 2005 and 2006. (Tr. 15). In 2003, he reported 48 MCF, which he agreed is minimal production not even enough to heat a single house. (Tr. 13-15). In 2004, Daniel did not know how much gas the Well produced and simply reported the same minimal amount from 2003. (Tr. 13-14). Daniel also admitted that on its tax forms for the years 2005, 2006, and 2007, Weiss reported losses to the IRS. (Tr. 15-19). And although Weiss did not provide its tax form for 2003 and 2004, Daniel admitted that the Well lost money those two years

also. (Tr. 19-21). Thus, he admitted that the Well lost money for five straight years. (Tr. 20-21). Moreover, Daniel testified the Well declared losses in 1983, 1984, 1985, 1986, and 1987. (Tr. 34). Daniel did not have the tax forms for the Well for the years 1988 through 2004. (Tr. 35-36). Daniel referred to the Well as a "money loser." (Tr. 34). And he admitted the Well did not show a profit until 2008. (Tr. 36-37). In fact, he conceded it was accurate to say that the Well may have been profitable until 1983 at which point it was unprofitable and remained unprofitable until 2008. (Tr. 37).

{¶21} Daniel testified that the reason for the Well's nonproduction in 2005 and 2006 was that the pump was broke. (Tr. 72-73). He stated the problem may have even dated back as far as 2003. (Tr. 73). Daniel and his brother Larry Weiss took numerous measures to repair it but were unsuccessful. (Tr. 74). They also contacted several people to repair it but they were booked a year in advance. (Tr. 74-76). Daniel finally contacted a company to make the needed repairs some time in 2005. (Tr. 76). After the repairs were completed, Daniel stated it took months to pump out all of the water. (Tr. 76-77).

{¶22} Daniel testified that nothing was done to fix the Well in 2003, 2004, or 2005, but that in 2006, he had the Well repaired. (Tr. 127-128). He opined this was reasonable diligence. (Tr. 127). Larry Weiss testified regarding the attempts he and Daniel made to repair the Well before another company came out to make the repairs in June 2006. (Tr. 176-180).

{¶23} As to the royalties paid, Daniel testified that he sent the Millers a royalty check of approximately $50 in December 2005. (Tr. 26-27). Daniel admitted he should not have paid any royalties that year, however, because he recorded zero production. (Tr. 27). Daniel next testified that he sent a royalty check of approximately $30 to the Millers in December 2006. (Tr. 28). He once again admitted he should not have sent a royalty check. (Tr. 28). Thus, he admitted no royalties should have been paid in 2005 or 2006, because no gas was produced from the Well during these years. (Tr. 27-29). Daniel stated that he has paid royalties to the Millers throughout the life of the Well. (Tr. 122).

**{¶24}** Daniel also testified regarding the Well's "common meter." Daniel stated that up until November 2007, the Well was run through one common meter with two other wells. (Tr. 29). He admitted it was incorrect to do this. (Tr. 29). Because the Well was not on its own meter, Daniel admitted he had no way to say how much of the gas that went through the common meter was actually produced from the Well. (Tr. 30). Therefore, he admitted that all of the royalty checks Weiss paid in the years prior to November 2007, were merely estimates. (Tr. 30, 131). In 2007, an individual meter was installed on the Well. (Tr. 78).

**{¶25}** Daniel stated that a "handful" of wells were run through the common meter prior to 2007. (Tr. 79). He said it was a way to keep costs down. (Tr. 80). Daniel stated he knew the history of the other wells that were run through the common meter, so he was able to figure out how much of the gas was attributable to them. (Tr. 80). Daniel stated that when determining royalty payments to the landowner associated with a well that is run through a common meter, he would assign a certain amount of MCFs to each well under the common meter. (Tr. 85). He assigned the MCFs based on the past performance of the other wells. (Tr. 86).

**{¶26}** Antero and Weiss argue the court should have considered a period of temporary cessation of production from the Well in 2005 and 2006, while it sought to have a pump repaired. The trial court may have considered this time as a temporary cessation of production if 2005 and 2006 were the only years gas was not produced in paying quantities. But the evidence was that the Well was not profitable from 1983 through 1987, and again was not profitable from 2003 through 2007. Moreover, the Well was likely not profitable from 1988 through 2002 either, but the paperwork was not available to confirm this. Thus, the court considered more than just a two-year period of non-production. Moreover, other courts have held that a lease expires when there is no oil or gas produced for two years or more. *Schultheiss*, 2016-Ohio-121; *Wagner*, 8 Ohio App.3d 90, 94.

**{¶27}** The trial court did not err in failing to apply a period of temporary cessation. Its judgment is supported by competent, credible evidence.

**{¶28}** Accordingly, Antero's first assignment of error is without merit and is overruled. Likewise, Weiss's second assignment of error is without merit and is overruled.

**{¶29}** Antero's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT HELD THAT THE LEASE TERMINATED FOR FAILURE TO PRODUCE IN PAYING QUANTITIES, DESPITE THE FACT THAT THE LESSEE OPERATED THE WELL AT A PROFIT FROM 1988 THROUGH 2002 AND AGAIN FROM 2008 FORWARD.

**{¶30}** Weiss's first assignment of error states:

THE TRIAL COURT ERRED IN CONCLUDING THAT THE SUBJECT LEASE WAS TERMINATED DUE TO LACK OR [sic.] PRODUCTION.

**{¶31}** In this assignment of error, Antero contends it presented evidence that Weiss operated the Well at a profit from 1988 to 2002. Antero points to the Working Interest Owners' Detail Sheets (Joint Tr. Ex. 71), which it claims shows that the revenue Weiss received each year from 1988 through 2002, exceeded the expenses attributable to the Well for each of those years. Antero admits that the Working Interest Owners' Detail Sheets for 2003 through 2007, reflect no dividends were paid for these years. But it asserts this was because of the temporary cessation in production discussed in its first assignment of error. Antero goes on to assert that the Working Interest Owners' Detail Sheets for 2008 forward show a clear profit and payment of dividends.

**{¶32}** Weiss argues the evidence demonstrated that the Well produced in paying quantities for most of the time in question. Weiss also argues the court based its decision on a two to three year time period when the Well was not producing because it was in disrepair. But it contends the court should have considered a

longer period of time to allow for fluctuation.

**{¶33}** The term "paying quantities," when used in the habendum clause of an oil and gas lease, generally mean quantities of oil or gas sufficient to yield even a small profit to the lessee over operating expenses, even though such things as drilling costs or equipping costs are not recovered which may result in the undertaking as a whole suffering a loss. *Blausey v. Stein*, 61 Ohio St.2d 264, 265-266, 400 N.E.2d 408 (1980).

**{¶34}** Despite the Langs' argument against this standard, this court recently reiterated that the lessee has discretion to determine whether a well is profitable. *Burkhart Family Trust v. Antero Resources Corp.,* 7th Dist. No. 14 MO 0019, 2016-Ohio-4817, ¶ 18. And while the lessee has discretion to determine a well's profitability, the determination of whether a well is profitable cannot be arbitrary. *Id.*, citing *Hupp v. Beck*, 7th Dist. Nos. 12 MO 6, 13 MO 2, 13 MO 3, 13 MO 11, 2014-Ohio-4255, ¶ 103. Instead, courts impose a standard of good faith on the lessee. *Id.,* citing *Hupp.* Thus, the trial court applied the correct test.

**{¶35}** Here, Antero asserts it presented evidence that the Well was profitable from 1988 to 2002, and that the Well has been profitable from 2008 to the present day. The problem with this argument, however, is that for the years 2003, 2004, 2005, 2006, and 2007, Antero makes no assertion of profitability. Likewise, it makes no assertion of profitability from 1983 through 1987. It claims that during 2005 and 2006 the Well did not produce any gas because of the broken pump, but this does not account for the other years. Daniel Weiss himself called the Well a bad well and admitted it was not profitable from 1983 through 2007. Thus, any evidence that the Well has been profitable from 2008 to the present would be irrelevant because the Lease would have terminated prior to 2008 due to lack of production.

**{¶36}** Moreover, even though Weiss paid royalties during this time, the royalties were speculative some years and unwarranted other years. Daniel testified that Weiss should not have paid any royalties at all in 2005 and 2006. And he testified that any royalties paid prior to 2007, were merely estimates because the

Well was being run through a common meter.

**{¶37}** Therefore, competent, credible evidence supports the trial court's judgment that the Lease terminated for failure to produce in paying quantities.

**{¶38}** Accordingly, Antero's second assignment of error is without merit and is overruled. Likewise, Weiss's first assignment of error is without merit and is overruled.

**{¶39}** Antero's third assignment of error states:

> THE TRIAL COURT ERRED WHEN IT FAILED TO RECOGNIZE THAT COMMON METERING IS AN ACCEPTED PRACTICE FOR MEASURING PRODUCTION FROM THE WELL PRIOR TO 2007.

**{¶40}** Here Antero contends the trial court failed to accept that Weiss's common metering system is an accepted industry practice. Antero takes issue with the court's finding that prior to 2008, the Well's reported production "was an estimate at best." Antero claims the court ignored the testimony it offered that the use of a common meter is an accepted practice for measuring production and paying royalties.

**{¶41}** Antero relies on evidence that prior to 2007, the Well shared a common meter with anywhere from two to five other wells. (Joint Stip. ¶ 13). According to Daniel, when Weiss received the production statement from the purchaser of the gas, it attributed production among the commonly metered wells based upon the historical performance of the other wells. (Tr. 81-83, 85).

**{¶42}** Antero also cites to Chuck Dye's testimony. Dye is an experienced owner and operator of oil and gas wells. Dye testified that, like Weiss, he allocates production from commonly-metered wells based upon historical performance of the wells. (Tr. 197, 204-205). He also testified that several other operators in Monroe County also use common metering. (Tr. 206).

**{¶43}** Antero and Weiss presented evidence that common metering can be an

accepted practice by some oil and gas companies for purposes of their internal records and paying royalties. But just because this practice is accepted by some oil and gas companies does not mean that the trial court had to accept it in this case as a valid means to measure production for purposes of whether a well is producing paying quantities of gas. It is reasonable for the court to require a more accurate method of measuring gas production. The court must be able to quantify production from the particular well at issue. It should not be required to guesstimate the amount of gas attributable to the well in question when the party responsible for the metering has chosen to use a common meter for multiple wells as opposed to individual meters for each well.

{¶44} Accordingly, Antero's third assignment of error is without merit and is overruled.

{¶45} Antero's fourth assignment of error states:

THE TRIAL COURT ERRED WHEN IT FOUND THAT THE WELL WAS NOT PROFITABLE DURING THE YEARS 1983 THROUGH 1987.

{¶46} Antero asserts the trial court should not have found that the Well was unprofitable from 1983 through 1987. It claims the court's finding was based on IRS Form 1065, Schedule K-1's submitted by Weiss's predecessor in interest. Antero argues that while the forms reflect an overall loss, the Langs provided no foundation regarding the nature of the loss. Therefore, Antero asserts, there was no foundation for the court's conclusion that the Well was not profitable from 1983 through 1987. Antero claims the Schedule K-1's are of little value. It claims the parties would need other supporting documents to show the actual revenue and expenses for the Well for those years. Antero claims the trial court could only have concluded that the Well did not produce in paying quantities from 1983 to 1987 by assuming facts that were not in the evidence. It maintains that without knowing the nature of losses reported on the Schedule K-1's, the fact that the Schedule K-1's reflect a loss is not probative

of whether the Well produced in paying quantities during that time.

**{¶47}** Daniel testified the Well declared losses in 1983, 1984, 1985, 1986, and 1987. (Tr. 34). He also referred to the Well as a "money loser." (Tr. 34). Daniel further testified the Well did not show a profit until 2008. (Tr. 36-37). He even admitted it was accurate to say that the Well may have been profitable up until 1983, but from then on it was unprofitable until 2008. (Tr. 37). Thus, in addition to the K-1 tax forms, Daniel's testimony supported the trial court's finding that the Well was unprofitable from 1983 through 1987.

**{¶48}** Additionally, the Well was hooked up to a common meter during this time. So Weiss could not even state with accuracy how much gas the Well might have produced during that time.

**{¶49}** Accordingly, Antero's fourth assignment of error is without merit and is overruled.

**{¶50}** Antero's fifth assignment of error states:

> THE TRIAL COURT ERRED WHEN IT BASED ITS HOLDING ON AN ALLEGED MOTIVE ON THE PART OF WEISS.

**{¶51}** In its final assignment of error, Antero argues the trial court erred in relying on Daniel Weiss's statement that his primary reason for defending this case and trying to keep the Lease active is because of the future potential benefit of the shale production. It asserts that the court's conclusion as to motive was based simply on an inference of bad faith.

**{¶52}** At trial, Daniel testified as to his motivation to keep the Well productive. Daniel stated that he only started reporting the gas used by the Langs' house after he sold his deep rights to Antero. (Tr. 33). He stated he did this in order to keep his production numbers up to maintain the Lease. (Tr. 33). And he admitted he wanted to keep the Lease because of the future production from the Utica Shale. (Tr. 33). He stated Weiss has a significant financial motive to keep the Lease active. (Tr. 45).

**{¶53}** Daniel admitted through his testimony that he only tried to maintain the

Lease because Weiss has a significant financial motive in the deep rights it sold to Antero. The court noted this evidence in its judgment.

**{¶54}** Weiss's financial motive for attempting to maintain the Lease is irrelevant to the issue in this case, which is whether the Lease ended by its terms for lack of production in paying quantities. Clearly, all of the parties involved in this litigation have a financial motive. But the fact that the court mentioned Weiss's financial motive in its judgment does not affect the fact that the weight of the evidence supports the court's judgment that the Lease terminated.

**{¶55}** Accordingly, Antero's fifth assignment of error is without merit and is overruled.

**{¶56}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

Robb, J., concurs.