[Cite as *Jacobs v. Dye Oil, L.L.C.*, 2019-Ohio-4085.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

TERESA A. JACOBS ET AL.,

Plaintiffs-Appellants,

v.

DYE OIL, LLC ET AL.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 18 MO 0020**

---

Civil Appeal from the
Court of Common Pleas of Monroe County, Ohio
Case No. 2017-189

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. John Burnworth*, and *Atty. Matthew Onest*, Krugliak, Wilkins, Griffiths, and Dougherty, 4775 Munson Street, NW, P.O. Box 36963, Canton, Ohio 44735, for Plaintiffs-Appellants and

*Atty. Craig Sweeney,* and *Atty. Aaron Bruggeman,* Bricker and Eckler LLP, 258 Front Street, Marietta, Ohio 43215, for Defendants-Appellees.

Dated: September 30, 2019

---

**D'APOLITO, J.**

{¶1} Plaintiffs-Appellants, Teresa A. Jacobs, Michael B. Jacobs, and Nicholas B. Jacobs, appeal the entry of summary judgment by the Monroe County Court of Common Pleas in favor of Defendants-Appellees, Dye Oil, LLC ("Dye Oil"), Janet Dye, Chuck Dye, Linda Dye Ludwig, Rebecca Ann Swecker, Unglaciated Industries, Inc. ("Unglaciated"), MNW Energy, LLC ("MNW"), and Triad Hunter, LLC ("Triad"), in this action for a declaratory judgment that an oil and gas lease expired on its own terms, due to lack of production in paying quantities and the payment of royalties, for breach of contract, breach of implied covenants, conversion and trespass. Appellants also appeal the denial of their cross motion for summary judgment that the oil and gas lease expired on its own terms, and their claim for conversion of oil and gas following the alleged expiration of the lease, as well as for attorney fees pursuant to R.C. 5301.09. For the following reasons, the judgment of the trial court is affirmed.

## FACTS

{¶2} Appellants acquired ten acres of real estate located in Washington Township, Monroe County, Ohio, more specifically described as Parcel No. 29-0280130.000, by warranty deed recorded on December 1, 2010 ("Property" or "ten acres"). Appellants' predecessor-in-interest, Zillah Adams, entered into an oil and gas lease with Walter Dye and Victor Dye on October 1, 1979, which was recorded on April 27, 1982 in Volume 122, Page 993 of the Lease Records of Monroe County, Ohio ("Lease").

{¶3} The Lease encumbers approximately 73.20 total acres ("Leased Premises"), which includes the ten acres at issue in this appeal. The Lease reads, in pertinent part:

> That the lessor does hereby grant unto the lessee for the term of two years
> (and so long thereafter as oil or gas is produced from the land leased and

Case No. 18 MO 0020

royalty or rentals paid by lessee therefor) the exclusive right to mine for and produce petroleum and natural gas from and the possession of so much of 73.20 acres of land in Washington Township, Monroe County, State of Ohio, as may be necessary therefor.

{¶4}    Relevant to this appeal, the Lease contains a drilling clause, which provides that the Lease "is to be null and void and no longer binding on either party if a well is not commenced on the premises within 24 months from [October 1, 1979] * * *" The Lease also contains a free domestic gas clause, which reads "[i]f gas is found on the premises, the lessee is to have sufficient gas for fuel purposes in the operation of this lease; lessor is to have gas for one house thousand cu. ft. of gas [sic], free of charge." (Lease, p. 1.)

{¶5}    According to a permit dated November 13, 1979, Walter and Victor Dye were authorized by the state to reopen a previously plugged oil and gas well on the Leased Premises – "Adams #1," API #34-111-2-1747-0000 ("Well"). Chuck Dye, Walter Dye's son, testified that Walter Dye drilled a new well in the place of the plugged well, and that the term "reopen" in the permit appears to have been a result of "confusion about terminology" on the part of Walter Dye. (Chuck Dye Depo., p. 96-97, 100.)

{¶6}    On February 14, 1980, Walter and Victor Dye entered into an oil sales agreement with Main Star Oil Company. On March 29, 1980, Perfection Services, Inc. performed testing and completed a Radioactivity Log. According to the affidavits of Chuck Dye and Janet Dye, Walter Dye's wife and the individual responsible for maintaining records for Walter Dye and Dye Oil, sales of oil and gas from the Well commenced in the spring of 1980, shortly after the oil sales agreement was executed and the gas radioactivity log was completed.

{¶7}    Appellants contend that production could not have commenced prior to the expiration of the primary term, based on an undated Well Completion Report form (revised 7/27/81), which reads, in pertinent part:

DATE DRILLING COMENCED:        11/13/79

DATE DRILLING COMPLETED:       4/14/89

DATE PUT INTO PRODUCTION:      NOT YET

Case No. 18 MO 0020

{¶8}  The Well was fracked in the spring of 1982 in order to increase gas production.  On April 27, 1982, Walter Dye entered into a gas sales agreement with the River Gas Company.

{¶9}  Victor Dye transferred any and all interest in and to the Lease to Walter Dye, by Assignment dated April 27, 2001, which was recorded on May 2, 2001.  In exchange for Victor Dye's interest in the Lease, and his agreement to maintain and pump the wells subject to the Lease, Walter Dye agreed to a monthly payment of $500.00 to Victor Dye, and to provide free domestic gas to Victor and Georgie Dye's current residence for as long as they continued to reside there.

{¶10}  Walter Dye later commingled gas from the Well with other oil and gas wells that he owned and operated, and sold the gas through a common meter, #W265, also known as the Ullman meter.  By letter dated July 21, 2003, Lawrence P. Adams, the then-owner of the surface and minerals, authorized Walter Dye to sell natural gas through the Ullman Meter.  From that point forward, gas from the Well has been sold through the Ullman meter, with 25% of the total gas production attributed to the Well.

{¶11}  Walter Dye died testate on December 16, 2012 and his rights in and to the Lease passed to Janet Dye.  On July 26, 2013, Janet Dye and her children – Chuck Dye, Linda Dye Ludwig, and Rebecca Ann Swecker, assigned the deep rights to MNW, but reserved the shallow rights.  MNW, characterized by Chuck Dye as a "lease gathering company," subsequently assigned the deep rights to Triad. (Chuck Dye Depo. 135-136).  On June 30, 2015, Janet Dye transferred the shallow rights by assignment to Dye Oil, which assigned them to Unglaciated on October 9, 2015.

{¶12}  Relevant to this appeal, the chain of title to the surface of the Leased Premises is as follows:

Zillah B. Adams to Lawrence Adams by Certificate of Transfer dated December 1, 1980 and recorded in Volume 178, Page 823 of the Monroe County Deed Records (73.20 acres).

Lawrence P. Adams and Freda I. Adams to Wilbert W. West and Irene West by deed dated May 30, 1986 and recorded in Volume 191, Page 76 of the Monroe County Deed Records (ten acres) ("Adams-West Deed").  The

Adamses reserved all the oil and gas royalty, rentals and leasing rights in and under the Property for a period of 25 years ("Adams Reservation").

Lawrence Adams and Freda Adams to The United States of America by deed dated November 30, 1988 and recorded in Volume 197, Page 342 of the Monroe County Deed Records (63.20 acres) ("USA Deed"). The Adamses reserved all of the oil and gas rights until November 30, 2038.

Wilbert W. West and Irene West to Lloyd Thomas and Ruby Thomas by deed dated August 9, 1990 and recorded in Volume 202, Page 48 of the Monroe County Deed Records (ten acres).

Lloyd Thomas, Jr. to [Appellants] by deed dated December 1, 2010 recorded in Volume 196, Page 983 of the Monroe County Official Records (ten acres).

**{¶13}** Pursuant to both the Adams Reservation and the reservation in the USA Deed, Appellees continued to pay royalties to the Adamses and their heirs and assigns after the Adamses sold the surface of the Property. The Adams Reservation expired by its own terms on May 31, 2011.

**{¶14}** Appellants offered the affidavits of Michael and Teresa Jacobs to establish that Walter Dye was aware in 2011 that Appellants had purchased the Property. Both affiants describe a series of interactions with Walter Dye, which establish that he knew the Jacobses, and he was aware that they purchased the surface rights to the Property.

**{¶15}** Michael and Teresa Jacobs further averred that they verbally informed Walter Dye in the spring of 2012 that they "wanted gas from [the line running through their property]." Teresa Jacobs states that "[they] told [Walter Dye] [they] wanted free gas under the lease." (Affidavit of Teresa Jacobs ¶ 7). According to the Jacobses' affidavits, Walter Dye became agitated, and, according to Teresa Jacobs, Walter Dye told them that "he needed his gas for production." (*Id.*) Michael Jacobs appears to concede that the Jacobses did not inform Walter Dye that the Adams reservation had expired in the spring of 2012, because Michael Jacobs admits that they "really did not understand the lease [at that time], except it said gas for one house." (Affidavit of Michael Jacobs Aff. ¶ 13).

Case No. 18 MO 0020

**{¶16}** Michael Jacobs attests that Bill Knowlton, who was a friend of Chuck Dye and volunteered to approach him about Appellants' "situation," said that Chuck Dye "did not want to be bothered with [Appellants] until after his father died." (M. Jacobs Aff. ¶ 14.) The remainder of Michael Jacobs' affidavit does not explain whether the "situation" was the expiration of the Adams reservation, Appellants desire for free domestic gas, or Appellants' acquisition of the surface rights to the property.

**{¶17}** On February 24, 2012, Appellants recorded an affidavit, which documented their ownership of the mineral rights in the ten acres effective May 31, 2011. The affidavit reads, in pertinent part, "Know by this claim that we own all the oil and gas royalty, rentals, and leasing rights in and under the described as follows premises * * *."

**{¶18}** Roughly two years after Walter Dye's death, on January 21, 2014, Appellants sent a letter to Janet Dye, which states that the Jacobses own the ten acres and that the Adams reservation expired on May 30, 2011. The letter demands back royalties from that date and free domestic gas. The letter also requests information about the Well and the oil and gas production from 2011 to 2013. The letter indicates that a copy of the Adams-West Deed was attached to the correspondence, although the attachment is not included in the copy of the letter in the record.

**{¶19}** Janet and Chuck Dye responded by letter dated May 30, 2014. The letter states that Janet Dye, who was in the process of transferring ownership of the Lease to Dye Oil, would pay back royalties (2011 to 2013) upon receipt of tax documents signed by the Jacobses. Janet Dye explained that she was willing to pay back royalties because the Dyes did not want Appellants to pursue any recovery from Freda Adams. Janet Dye further explained Dye Oil would pay Appellants gas royalties in the future, but that future oil royalties would be paid directly from the oil purchaser. Future oil royalties were conditioned on the provision of addresses for all three Appellants and the submission of the requested tax forms. The letter further stated that Dye Oil would provide domestic gas to Appellants' residence as an accommodation, despite the fact that the Dyes' attorney informed them that the demolition of the original residence on the Property operated to terminate the domestic gas provision in the Lease.

**{¶20}** The letter reads, in pertinent part, "[y]our lease provides that any change in ownership is not binding upon us until we receive notice of change of ownership." However, there is no change of ownership provision in the Lease. The letter concludes:

> As soon as we receive addresses and tax information from all three of you, we will send royalty checks from production from June 2011 through December 2013. Income received in 2014 will be paid at the end of this year, as previously indicated in this letter. Upon receipt of our requested information we will also notify Ergon Oil to modify the Division of Interest for the Adams Well, reflecting a decrease in Ms. Adams interest which is to be replaced with each of your 0.569% interests. Also, after we receive the signed and notarized Hold Harmless Agreement we can discuss a convenient time to start the process of getting your house gas hooked-up.

> If you have any questions please don't hesitate to contact us.

(Letter, p. 2).

**{¶21}** Appellants received a second letter from Janet Dye, dated May 30, 2014, which explained that the provision of domestic gas was conditioned on a connection at the well head and proper maintenance of Appellants' gas system. The letter concludes with a form affidavit, to be executed by the Jacobses, acknowledging their responsibilities as set forth in the letter, as well as an agreement to indemnify and hold harmless Dye Oil from any and all liability associated with the installation, maintenance, and distribution of domestic gas at the dwelling.

**{¶22}** The Jacobses responded by letter dated June 5, 2014, which states that they "did not agree to [the Dyes'] new terms and "reject[ed] [their] offer." The Jacobses enclosed a "Notice of Intent to Cancel Oil and Gas Lease Under [R.C.] 5101.332" ("affidavit of noncompliance"). On July 23, 2014, Teresa Jacobs recorded the affidavit of noncompliance. In the meantime, Janet Dye, then Dye Oil, continued to pay royalties for the entire leasehold to Freda Adams.

**{¶23}** The original complaint was filed on June 22, 2017 and named Dye Oil, LLC, Janet E. Dye, Chuck Dye, Rebecca Ann Swecker, Linda Dye Ludwig, and Triad as

defendants. After discovering that Unglaciated was a necessary interested party, Appellants added Unglaciated as a defendant by filing their first amended complaint instanter on April 27, 2018.

{¶24} The first amended complaint alleged expiration of the Lease pursuant to R.C. 5301.09 for failure to pay royalties, and for lack of production in paying quantities (stated as a quiet title action)(count one); for breach of implied covenants to explore and reasonably develop the property, protect against drainage, exercise reasonable care and due diligence, conduct their operations as a reasonably prudent operator, and for breach of the implied covenant of faith and fair dealing (count two), for breach of contract based on the failure to pay royalties and to provide free domestic gas (count three); conversion (count four); and trespass (count five).

{¶25} The parties filed cross motions for summary judgment on June 29, 2018. Appellants moved for summary judgment on their claims for expiration of the Lease and conversion, as well as their claim for attorneys' fees. Appellees moved for summary judgment on all of the claims. The parties filed opposition briefs to the respective motions on July 13, 2018. Appellees filed their reply brief on July 20, 2018. Appellants filed their reply brief on July 27, 2018.

{¶26} Appellants predicated their motion for summary judgment on the Jacobses' affidavits regarding their verbal exchanges with the late Walter Dye, and "Ohio Return of Oil and Gas Properties" forms submitted by Walter Dye to the county auditor for Permit No. 1747 ("Ohio oil and gas returns"), in which he provided no "valuation of royalty interest" for 2011, 2008, 2006, 2000-2004 and 1995. In the Ohio oil and gas return, Walter Dye attested that no oil or gas had been produced in 2006, 2000-2004, and 1998. Appellants also offered Well Completion Reports that established no oil or production in 1991 to 1992, 1996, and 2006. Next, Appellants relied on significant financial losses from the business, reported on Schedule C of I.R.S. Form 1040, suffered by the Dyes in 2014 ($18,147 in gross receipts and $229,967 in expenses for a net loss of $211,820) and 2015 ($64,937 in gross receipts and $83,389 in expenses for a net loss of $18,452). Finally, Appellants argued that the Dyes failed to maintain proper records, which would have revealed a lack of productivity in 2014 and 2015.

Case No. 18 MO 0020

**{¶27}** Appellants argued that lessees may insulate themselves from paying quantities challenges by intentionally failing to keep records of income and expenses for each individual well. Evidence in the record establishes that Walter Dye estimated the wells' output when the outputs were first commingled based on historical performance. Later, Walter Dye would shut down all of the wells but for one, for a period of two days to a week to update the functioning well's output ratio. Any demonstrable increase in oil production would prompt a re-evaluation of both oil and gas output. (Chuck Dye Depo., p. 49-55). No adjustments had been made since Walter Dye's death in 2012. (*Id.*)

**{¶28}** Appellees predicated their motion for summary judgment on our opinion in *Potts v. Unglaciated Industries, Inc.*, 7th Dist. Monroe No. 15 MO 0003, 2016-Ohio-8559, 77 N.E.3d 415. Appellees argued that the applicable statute of limitations prohibited Appellants from relying on evidence of lack of paying quantities prior to 2002. Appellees further argued that Appellants' breach of contract claim based on the failure to timely drill the Well or commence the sale of oil and gas within two years of the execution of the Lease was time barred.

**{¶29}** Next, Appellees asserted that oil and gas had been produced from 2002 to the present, and that Appellants had the burden of proof to show that production was not in paying quantities. Appellees relied on the averments in the Dyes' affidavits to establish that sales of oil and gas began in the spring of 1980, shortly after the execution of the oil sales agreement and the completion of the radioactivity log, and that the Well has continued to produce in paying quantities through the present day.

**{¶30}** Appellees offered statements from Dominion East Ohio for each month in 2002 for gas produced by the Well, as well as production reports, and check statements from Ergon Oil Purchasing Inc., which establish oil production by the Lease in 2003-2005, and 2009-2015. The Ohio oil and gas returns submitted by Appellants show oil and gas production in 2007. Likewise, the Ohio Well Completion Report reflect the production of oil or gas, or both, from the Lease in 1989, 1993-1995, 1997-2005 and 2007-2011, and 2013-2016. An Ergon Oil check statement attached to Appellees' partial motion for summary judgment establishes oil production in 2017.

**{¶31}** Because 2006 is the only year between 2002 and 2017 for which there is no evidence of production from the Lease, Appellees argued that Appellants did not offer

sufficient evidence to create a genuine issue of material fact regarding their lack of paying quantities claim. Appellees further argued that Janet Dye's letters established her willingness to pay back and future royalties, as well as provide free domestic gas, conditioned on certain administrative requirements. Based on Janet Dye's letters, Appellees asserted that Appellants could not demonstrate their breach of contract claims, or their forfeiture claim based on the failure to pay royalties. Next, Appellees argued that Appellants had not offered any evidence to show a breach of implied covenants in the Lease. Finally, insofar as the Lease did not terminate on its own terms, Appellees argued that summary judgment should be entered on Appellants' conversion and trespass claims.

**{¶32}** On September 6, 2018, the trial court granted summary judgment in favor of the Appellees on all claims on the grounds that Appellees: (1) continuously produced oil and gas in paying quantities during the relevant time period; (2) continuously paid landowner royalties pursuant to the terms of the Lease; (3) did not commit trespass or conversion; (4) timely drilled a well on the leasehold premises; and (5) did not breach any of the implied covenants contained in the Lease. This timely appeal followed.

## STANDARD OF REVIEW

**{¶33}** This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a *de novo* review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

{¶34} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Doe v. Skaggs*, 7th Dist. Belmont No. 18 BE 0005, 2018-Ohio-5402, ¶ 11. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327.

{¶35} The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. The proper procedure for introducing evidentiary matter not specifically authorized by Civ.R. 56(C) is to incorporate it by reference in a properly framed affidavit pursuant to Civ.R. 56(E). *Rhodes v. Sinclair*, 7th Dist. Mahoning No. 08-MA-23, 2012-Ohio-5848, ¶ 50.

## STATUTE OF LIMITATIONS

{¶36} Although the trial court did not address Appellees' statute of limitations arguments, we find that the statute of limitations applicable to oil and gas leases completely forecloses Appellants' breach of contract claim based on the failure to drill a new well or to commence production in the primary term. The applicable limitations statute also restricts the time period upon which Appellants may rely for recovery with respect to their other claims. R.C. 2305.041, captioned "Actions regarding breach of lease or license for oil and gas drilling," reads, in its entirety:

> With respect to a lease or license by which a right is granted to operate or
> to sink or drill wells on land in this state for natural gas or petroleum and
> that is recorded in accordance with section 5301.09 of the Revised Code,

Case No. 18 MO 0020

an action alleging breach of any express or implied provision of the lease or license concerning the calculation or payment of royalties shall be brought within the time period that is specified in section 1302.98 of the Revised Code. An action alleging a breach with respect to any other issue that the lease or license involves shall be brought within the time period specified in section 2305.06 of the Revised Code.

**{¶37}** We observed in *Potts, supra,* that the statute of limitations for contracts in R.C. 2305.06 governs actions alleging the expiration of a lease for failure to produce in paying quantities. *Id.* at ¶ 113, citing R.C. 2305.041. Because the statute of limitations for an action on a written agreement was amended from 15 years to 8 years on September 28, 2012, the limitation period applicable to Appellees' paying quantities claim is governed by the uncodified law that accompanied the 2012 amendment to R.C. 2305.06. Section 4 of the uncodified law provides, in its entirety:

For causes of action that are governed by section 2305.06 of the Revised Code and accrued prior to the effective date of this act, the period of limitations shall be eight years from the effective date of this act or the expiration of the period of limitations in effect prior to the effective date of this act, whichever occurs first.

**{¶38}** Accordingly, where a lease is in production, we find that the limitations period applicable to the production in paying quantities claim is the 15 years preceding the complaint, which began in this case on June 22, 2002. We further find that Appellants' breach of contract claim based on the drilling clause is time barred. See *Ricketts v. Everflow E., Inc.*, 7th Dist. Mahoning No. 14 MA 0103, 2016-Ohio-4807, 68 N.E.3d 165, ¶ 18.

**{¶39}** Appellants' claim for breach of contract for failure to pay royalties and provide free domestic gas is likewise set forth in R.C. 2305.041. The statute reads that the foregoing claims are governed by the four-year limitations period set forth in R.C. 1302.98, captioned "Statute of limitations in contracts for sale." Consequently, we find

Case No. 18 MO 0020

that Appellants' recovery of unpaid royalties is limited to royalties accruing from June 22, 2013 to the present.

**{¶40}** Appellees argue in their reply brief that the statute of limitations does not apply to their Lease expiration argument based on our decision in *Neuhart v. TransAtlantic Energy Corp.*, 7th Dist. Noble No. 17 NO 0449, 2018-Ohio-4099, 121 N.E.3d 802, reconsideration granted in part, 7th Dist. Noble No. 17 NO 04492018-Ohio-5115, appeal not allowed, 155 Ohio St.3d 1421, 2019-Ohio-1421, 120 N.E.3d 867. However, we specifically limited our holding in *Neuhart* to leases containing Pugh clauses. *Id.* at ¶ 17 ("neither *Ricketts* nor *Potts* involved a Pugh clause. This clause governs the rights and duties of the parties regarding the undrilled property. The right to control the undrilled property automatically reverted to Appellants at the end of the primary term by operation of this clause and discussion of any statute of limitations is irrelevant.") Therefore, with the foregoing limitation periods in mind, we address Appellants' substantive arguments.

## ANALYSIS

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED BY IGNORING THE PLAIN LANGUAGE OF THE HABENDUM CLAUSE OF THE OIL AND GAS LEASE AT ISSUE WHEN IT HELD THAT THE LEASE DID NOT EXPIRE WHEN THE LESSEE INTENTIONALLY PAID ROYALTIES TO THE WRONG LESSOR.**

**{¶41}** Oil and gas leases are contracts, and therefore, "'[t]he rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument.'" *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 2016-Ohio-7549, 71 N.E.3d 1010, ¶ 9, quoting *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129, 48 N.E. 502 (1897). "It is a well-known and established principle of contract interpretation that '[c]ontracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.'" *Lutz* at ¶ 9, quoting *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus.

**{¶42}** The burden of proof with respect to an oil and gas lease case is not controlled by substantive oil and gas law, but, rather, by civil procedure. *Pfalzgraf v. Miley,* 7th Dist. Monroe No. 16 MO 0005, 2018-Ohio-2828, 116 N.E.3d 893, ¶ 32, *reconsideration denied,* 7th Dist. Monroe No. 16 MO 00052018-Ohio-3595*, and appeal not allowed,* 154 Ohio St.3d 1443, 2018-Ohio-4962, 113 N.E.3d 552 (2018). The party who asserts a claim in an oil and gas case carries the burden of proof, just as in any other civil case. *Id.* at ¶ 45.

**{¶43}** After the primary term of an oil and gas lease expires, the lease terminates by the express terms of the contract and by operation of law, and revests the leased estate in the lessor, if the conditions of the secondary term are not being met. *Swallie v. Rousenberg*, 190 Ohio App.3d 473, 2010-Ohio-4573, 942 N.E.2d 1109 (7th Dist.), ¶ 63. Typically, the secondary term of the lease is conditioned on oil or gas being produced in paying quantities. *Dennison Bridge, Inc. v. Resource Energy, L.L.C.*, 7th Dist. Harrison No. 14 HA 0021, 2015-Ohio-4736, 50 N.E.3d 242, ¶ 21.

**{¶44}** Ohio courts have recognized forfeiture as an appropriate remedy only in certain, limited circumstances: (1) when the lease specifically and expressly provides for such a remedy; (2) when legal damages resulting from a contractual breach are inadequate; (3) upon a breach of implied covenants; (4) upon a claim of abandonment; or (5) when necessary to do justice. *Ionno v. Glen-Gery Corp.*, 2 Ohio St.3d 131, 134-135, 443 N.E.2d 504, 508 (1983). When causes for forfeiture are explicitly delineated in the lease, others cannot be implied. *Beer v. Griffith*, 61 Ohio St.2d 119, 121-122, 399 N.E.2d 1227 (1980).

**{¶45}** The secondary term in the Lease at issue here continues "so long thereafter as oil or gas is produced from the land leased and royalty or rentals paid by lessee therefor." In their first assignment of error, Appellants contend that the habendum clause in the Lease is unique because it predicates the secondary term not solely on production in paying quantities, but also on the payment of royalties. Appellants argue that the Lease terminated by its express terms when Janet Dye failed to make royalty payments to Appellants after May 30, 2011.

**{¶46}** Appellants' first assignment of error turns on their assertion that Janet Dye was obligated under the Lease to make royalty payments to Appellees on  May 30, 2011,

or, at the very latest, when she was notified that Appellants were the mineral interest owners in January of 2014. Appellants contend that Walter Dye was aware of their ownership of the mineral interest in the spring of 2011. Although the Jacobses' affidavits establish that Walter Dye was aware of their ownership of the surface rights to the property prior to his death, we find that the affidavits do not establish that Walter Dye was aware of the expiration of the Adams Reservation, or that ownership of the mineral rights passed to Appellants on May 30, 2011.

{¶47} With respect to Janet Dye, in her May 30, 2014 response to the Jacobses, she warrants that she will pay back royalties to the Jacobses conditioned on their completion of certain tax forms, which were never provided to Janet Dye. Janet Dye further warrants that she will provide free domestic gas as an accommodation, despite the fact that counsel had told her that the domestic gas provision applied solely to the original residence of the original lessor.

{¶48} In Ohio, the common law imposes an implied duty of good faith in the performance of contracts. *Myers v. Evergreen Land Dev. Ltd.,* 7th Dist. Mahoning No. 07 MA 123, 2008-Ohio-1062, ¶ 27, citing *B-Right Trucking Co. v. Interstate Plaza Consulting*, 154 Ohio App.3d 545, 2003-Ohio-5156, at ¶ 32. However, this duty is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. *Summitcrest, Inc. v. Eric Petroleum Corp.*, 7th Dist. Columbiana No. 12 CO 0055, 2016-Ohio-888, 60 N.E.3d 807, ¶ 60. "Good faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443-444, 662 N.E.2d 1074.

{¶49} An obligation of good faith generally arises only where a matter was not resolved explicitly by the parties. *Id.* at 444. Thus, the duty is not imposed when a matter is specifically covered by the written terms of a contract. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 274, 714 N.E.2d 898. Instead, this duty is implied only under limited circumstances, such as when the contract is silent as to an issue. In such a case, the parties must use good faith in filling the gap. *Myers*, supra, ¶ 28.

{¶50} In *Conny Farms, Ltd. v. Ball Resources, Inc.,* 7th Dist. Columbiana No. 12 CO 18, 2013-Ohio-2874, ¶ 28, we cited with favor a decision of the Fourth District Court of Appeals, in which the Fourth District imposed a notice requirement on the lessor in the absence of a change of ownership provision in an oil and gas lease. The facts in *Burlington Resources Oil & Gas v. Cox*, 133 Ohio App.3d 543, 548-549, 729 N.E.2d 398 (1999), are similar to the facts in this appeal.

{¶51} Unaware that the leased property had been sold, Burlington made the annual rental payment to the original lessee. When the payment was returned, Burlington forwarded a ratification agreement to the successor-lessees at the same address and warranted that the past-due monthly rental payment, and all future payments, would be made upon receipt of the ratification. Rather than executing the ratification agreement, the successor-lessee sent a notice of forfeiture. When the successor-lessees refused to permit Burlington on the property to conduct testing, Burlington filed a breach of contract action.

{¶52} Although there was no change of ownership provision in the lease, the Fourth District imposed a good faith notice requirement on the successor-lessee. The *Burlington* Court reasoned:

> The [lessors] argue that [the lessee] should fill the gap in this contract by using its vast resources each year to identify the lessors or successor lessors. The [lessors] do not say how [the lessee] should accomplish this task. Apparently, they want us to impose a duty of good faith upon [the lessee] to check the records at the [county recorder's office] each year before it sends out the eighty dollar rental payment. Under the terms the [lessors] seek to imply, if the contract remained in force for ten years, then [the lessee] would have the duty to check the record ten times. After carefully reviewing the terms of the lease, we do not think that the original parties intended to impose this yearly burden upon the lessee.

*Id.* at 548, 729 N.E.2d 398.

**{¶53}** Although the issue raised in this appeal is royalties, not rent, the same rationale applies. In the absence of a change of ownership provision, we find that Appellants had a good faith obligation to notify Appellees of the change in ownership in the mineral rights. We further find that reasonable notice, which includes documentary evidence establishing the lessor's right to royalties under the Lease, is required. To hold otherwise would require lessees to determine the proper names and addresses of every lessor, as well as their right to royalties under the Lease, annually, semi-annually, or even monthly, depending upon the royalty schedule, in order to avoid forfeiture of the entire Lease. As in *Burlington, supra,* Janet Dye did not refuse to pay the royalties that were due and owning, but, instead, conditioned payment upon the provision of tax forms. We find that the administrative requirement was reasonable and Janet Dye, and, subsequently, Dye Oil, were under no obligation to pay royalties until the condition set forth in the Janet Dye's May 30, 2014 letter was met.

**{¶54}** In their reply brief, Appellants liken the royalties provision in the Lease to a delay rental clause. Delay rental clauses typically state that the lease will automatically terminate and become null and void "unless" delay rentals are paid or "unless" drilling commences.

**{¶55}** Delay rental provisions are not treated as an obligation under a lease, but, instead, are designed to allow the lessee to terminate its obligation to drill or pay delay rentals where no oil and gas is found on the property. *New Hope Community Church v. Patriot Energy Partners, L.L.C.*, 7th Dist. Columbiana No. 12 CO 23, 2013-Ohio-5882, 6 N.E.3d 70, ¶ 61 (Waite, J, dissenting). Because delay rental provisions are unique under the law, we find that the royalties provision at issue here is not analogous.

**{¶56}** In summary, we find that the trial court did not err in concluding that the Lease did not expire on its own terms based on Janet Dye's failure to pay royalties to Appellants. The record reflects that Janet Dye acknowledged her obligation to Appellants under the Lease in May of 2014, and she agreed to pay back and future royalties conditioned upon the provision of Appellees' correct addresses and the completion of certain tax forms. In the absence of lease terms specifically addressing change of ownership and conditions precedent to the payment of royalties, we read into oil and gas leases in this district a good faith obligation on successor-lessors to provide reasonable

notice to the lessee of a change of ownership, which includes documentary evidence of their mineral interest rights. We further read into oil and gas leases a good faith obligation on lessors to comply with the administrative requirements of the lessee as a condition precedent to the payment of royalties. Accordingly, we find that Appellants' first assignment of error is meritless.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEES WHEN THE UNDISPUTED EVIDENCE SHOWED THAT THE ONLY WELL DRILLED UNDER THE LEASE AT ISSUE FIRST PRODUCED AFTER THE EXPIRATION OF THE PRIMARY TERM.**

**{¶57}** As previously noted, the breach of contract claims based on the assertion that the Well was not a new well and that it was not productive during the primary term of the Lease are barred by the applicable statute of limitations. Appellants further argue that the Well is an unpermitted well, however, this argument is raised for the first time on appeal. There is no second chance to raise arguments on appeal that should have been raised before the trial court. *Am. Express Centurian Bank v. Banaie*, 7th Dist. No. 10 MA 9, 2010-Ohio-6503, ¶ 24, *Conny Farms*, supra, ¶ 25.

**{¶58}** Even assuming that the breach of contract claim based on the commencement of the Well is not time barred, the plain language of the Lease requires that a well be "commenced" prior to the expiration of the primary term. The undated Well Completion Report form establishes that drilling commenced on November 13, 1979, consistent with the averments of Janet and Chuck Dye. However, Appellants contend that the secondary term is predicated upon commencement of production prior to the expiration of the primary term. We find that Appellants' interpretation is at odds with the unambiguous meaning of the phrase "that a well be commenced."

**{¶59}** Further, Appellants have failed to offer any evidence to establish that the alleged reopening of the plugged well is effectively different from drilling a new well. They have offered no evidence to show that a new well would have been more productive or that they suffered any damages as a result of the reopening a plugged well.

Case No. 18 MO 0020

{¶60} Accordingly, based on the applicable statute of limitations, or, in the alternative, the plain language of the Lease, we find that the trial court did not err in entering judgment in favor of Appellees on Appellants' breach of contract claims based on the failure to drill a new well and to commence production within the primary term. Therefore, Appellants' second assignment of error is meritless.

## ASSIGNMENT OF ERROR NO. 3

**THE TRIALCOURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEES ON THE ISSUE OF PAYING QUANTITIES BECAUSE THE LESSEE BREACHED ITS DUTY OF GOOD FAITH AND FAIR DEALING BY FAILING TO TRACK INCOME AND EXPENSES FOR THE WELL AT ISSUE AND BECAUSE THE TOTALITY OF THE EVIDENCE SHOWED THE LESSEE ADMITTED TO LOSING MONEY ON THE WELL AT ISSUE.**

{¶61} The term "paying quantities," when used in the habendum clause of an oil and gas lease, generally means quantities of oil or gas sufficient to yield even a small profit to the lessee over operating expenses, even though such things as drilling costs or equipping costs are not recovered, which may result in the undertaking as a whole suffering a loss. *Blausey v. Stein*, 61 Ohio St.2d 264, 265-266, 400 N.E.2d 408 (1980). In determining whether a well is profitable, courts look to the discretion of the lessee. *Lang v. Weiss Drilling Co.*, 7th Dist., 2016-Ohio-8213, 70 N.E.3d 625, ¶ 34. Although the lessee has discretion to determine a well's profitability, that determination cannot be arbitrary. *Id.* Courts impose a standard of good faith on the lessee. *Pfalzgraf v. Miley*, 7th Dist. Monroe No. 16 MO 0005, 2018-Ohio-2828, 116 N.E.3d 893, ¶ 17-19, reconsideration denied, 7th Dist. Monroe No. 16 MO 00052018-Ohio-3595, ¶ 17-19, and appeal not allowed, 154 Ohio St.3d 1443, 2018-Ohio-4962, 113 N.E.3d 552, ¶ 17-19 (2018).

{¶62} Production interruptions, ranging from temporary to permanent, are common with oil and gas leases. *Paulus v. Beck Energy Corp.*, 2017-Ohio-5716, 94 N.E.3d 73, ¶ 75 (7th Dist.). We adopted the general rule regarding gaps in production in

*RHDK Oil & Gas, L.L.C. v. Dye*, 7th Dist. Harrison No. 14 HA 0019, 2016-Ohio-4654, ¶ 20, appeal not allowed, 147 Ohio St.3d 1506, 2017-Ohio-261, 67 N.E.3d 823:

> [A] a mere temporary cessation in the production of a gas or oil well will not terminate the lease under a habendum clause of an oil and gas lease where the owner of the lease exercises reasonable diligence and good faith in attempting to resume production of the well.

*Id.* 20, quoting *Wagner v. Smith*, 8 Ohio App.3d 90, 92, 456 N.E.2d 523 (4th Dist.1982). "'[A] critical factor in determining the reasonableness of the operator's conduct is the length of time the well is out of production.'" *Id.*, quoting *Wagner* at 93, In addition to the length of time, a court must consider all attendant circumstances. *Id.*, citing *Barrett v. Dorr*, 140 Ind.App. 295, 212 N.E.2d 29 (1966).

**{¶63}** In *Dennison Bridge, Inc. v. Resource Energy, LLC*, 2015-Ohio-4736, 50 N.E.3d 242 (7th Dist.), we acknowledged there is no bright line rule in regard to cessation periods. However, no Ohio appellate court has recognized forfeiture by operation of law based on less than two years of nonproduction. *RDHK Oil & Gas, supra*, at ¶ 22, *see also Casto v. Positron Energy Resources, Inc.*, 4th Dist. Washington No. 14 CA 39, 2016-Ohio-285 (lease termination based on seven years of nonproduction); *Schultheiss v. Heinrich Ents. Inc.*, 4th Dist. Washington No. 15 CA 20, 2016-Ohio-121, 57 N.E.3d 361, (four years of nonproduction); *Lauer v. Positron Energy Resource*s, 4th Dist. Washington No. 13 CA 39, 2014-Ohio-4850 (two years of nonproduction); *Moore v. Adams*, 5th Dist. Tuscarawas No.2007AP090066, 2008-Ohio-5953 (six years of nonproduction); *Tisdale v. Walla*, 11th Dist. Ashtabula No. 94-A-0008, 1994 WL 738744 (Dec. 23, 1994) (twenty plus years of nonproduction); *Hanna v. Shorts*, 163 Ohio St. 44, 125 N.E. 338 (1955) (no oil or gas production during the secondary term).

**{¶64}** Appellants contend that the Well did not produce in paying quantities. In the alternative, Appellants argue that Appellees have breached the implied covenant of good faith and fair dealing in the Lease, because they did not maintain separate production and expense reports for each of the wells.

{¶65} All oil and gas leases have the implied covenant of good faith and fair dealing because all leases are contracts. *Yoder v. Artex Oil Co.*, 5th Dist. Guersney No. 14 CA 4, 2014-Ohio-5130, ¶ 51-52. ("[U]nder Ohio case law, it is well-established that every contract has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract."); *Stars of Cleveland, Inc. v. Fred Makin Dodge Suzuki, Inc.*, 5th Dist. Stark No. 2008CA001093, 2009-Ohio-4012, ¶ 41 ("In Ohio, there is a common law duty of good faith which is implied in the performance of contracts.") This duty requires honesty and reasonableness when seeking to enforce the terms of a contract. *Id.* It requires a party to conduct itself in a manner which is faithful to the parties' "agreed common purpose" and in a manner consistent with the other party's "justified expectations." *Yoder*, at ¶ 52 quoting *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 839 N.E.2d 49, ¶ 26 (1st Dist.2005).

{¶66} Chuck Dye testified that his parents assessed production based on "the oil field," a term coined by Janet Dye to refer to the entire enterprise. (*Id.*) Chuck Dye further testified that income and expenses from all of the wells owned by the Dyes were "all put in a common kitty." (*Id.* at 130). Janet and Chuck Dye both averred that sales of oil and gas began in the spring of 1980, shortly after the execution of the oil sales agreement and the gas radioactivity log, and that the Well has continued to produce in paying quantities through the present day.

{¶67} Janet and Chuck Dye conceded at their depositions that no expense records were maintained for the individual wells. Appellees assert that expenses were minimal, but Appellants counter that Victor Dye was paid $500.00 per month and provided free domestic gas for maintaining and pumping the wells.

{¶68} Chuck Dye explained that Walter Dye used his own method for calculating output from the Well following the implementation of the Ullman meter in 2003. Walter Dye based his calculation on gas production prior to the use of the common meter, and periodically modified the calculation based on oil output.

{¶69} Appellants cite *Lang v. Weiss Drilling Co.*, 7th Dist. Monroe No. 15 MO 0005, 2016-Ohio-8213, 70 N.E.3d 625, for the proposition that the Dyes acted in bad faith when they employed a common meter for wells from different leaseholds and estimated production based on historical performance. The well in *Lang* shared a common meter

Case No. 18 MO 0020

with two to five other wells. When the lessee received the production statement from the purchaser of the gas, the lessee attributed production among the commonly-metered wells based upon their historical performance.

{¶70} At the bench trial in *Lang*, the lessee relied on the testimony of Chuck Dye, who testified that he and other oil and gas well operators allocate production from commonly-metered wells based on historical performance. The lessee in *Lang* also presented additional evidence that common metering was an accepted practice by some oil and gas companies for purposes of their internal records and paying royalties.

{¶71} The lessee's vice president and operation manager in *Lang* conceded a lack of production in paying quantities from 1983 to 1987, 2003 to 2004, and 2007. He admitted that royalties were speculative in some years, and unwarranted in other years. He further admitted to making comments that the well was "a bad well and a money loser." Finally, he conceded that his sole motive to maintain the lease was for the potential benefit of speculating on future shale production. *Id.* at ¶ 6. Based on the foregoing evidence, the trial court concluded that the lease expired on its own terms based on a lack of production in paying quantities.

{¶72} Relevant to the above-captioned appeal, the trial court in *Lang* characterized the production information based on common metering offered at the bench trial as "an estimate at best." *Id.* at ¶ 43. On appeal, the lessee in *Lang* argued that the trial court ignored Chuck Dye's testimony that common metering was an accepted practice in the oil and gas industry. We opined that it was reasonable for the trial court to discount the evidence regarding common metering in light of other competent, credible, and compelling evidence in the record supporting the trial court's verdict.

{¶73} Here, the record contains undisputed testimonial and documentary evidence of oil and gas production from 2002 to the present, with the exception of 2006. Appellants carry the burden of proof to demonstrate a complete lack of production or a lack of production in paying quantities. In the face of uncontroverted evidence of production in paying quantities in the record, Appellants offer speculation that Appellees' evidence regarding production is not worthy of credence due to the use of the common meter. However, "[m]ere speculation or possibility is not enough to defeat a summary judgment motion." *Strama v. Allstate Ins.*, 7th Dist. Belmont No. 14 BE 8, 2015-Ohio-

2590, ¶ 43, citing *Allstate Ins. Co. v. Sears*, 7th Dist. No. 06 BE 10, 2007-Ohio-4977, ¶ 74.

**{¶74}** Therefore, Appellants have established that no oil and gas was produced from the Well in 2006, however, one year is insufficient in Ohio to establish a lack of paying quantities. Because Appellants have failed to offer any evidence to support their claim, we find that the trial court did not err in granting summary judgment on the production in paying quantities claim, and Appellants' third assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 4

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEES ON APPELLANTS' BREACH OF CONTRACT CLAIM BECAUSE IT IS UNDISPUTED THAT APPELLANTS ARE ENTITILED TO FREE GAS AND UNPAID ROYALTIES.**

**{¶75}** Appellants contend that Appellees breached the terms of the Lease because they did not pay royalties and provide free domestic gas from March 30, 2011 to the present. As previously stated, any claim based on royalties or free domestic gas accruing prior to June 22, 2013 is time barred.

**{¶76}** Appellees do not dispute that Appellants are the owners of the mineral interest under the Lease or that royalties are due and owing. Because we read a good faith obligation into the Lease that requires Appellants to provide reasonable administrative information requested by the lessee prior to the payment of royalties, we find that Appellees' failure to pay royalties prior to the submission of the requested administrative information is not a breach of contract.

**{¶77}** Although Appellees conceded Appellants' right to royalties, they do not concede Appellants' right to free domestic gas. In *Stapleton v. Columbia Gas Transmission Corp.*, 2 Ohio App.3d 15, 440 N.E.2d 575 (7th Dist.1981), we concluded that the right to free gas is a covenant that runs with the surface of the leasehold tract, rather than with the mineral estate, unless a contrary intent can be inferred from the lease. *Id.,* paragraph two of the syllabus. The right to receive free gas is ordinarily considered

personal to the lessors when the lease specifies the persons who are to receive free gas and the lease is silent with respect to extending the terms and conditions of the lease to the contracting parties, heirs and assigns. *Id.,* syllabus at paragraph three of the syllabus.

**{¶78}** Where a deed conveys property containing a dwelling with free gas and also conveys the property's privileges and appurtenances, the right to free gas passes to the buyer where the deed does not except free gas from the conveyance. *Id.* at 20, 440 N.E.2d 575. In *Stapleton*, none of the deeds in question referred to the right to free gas, however, one deed conveyed the tract of land with the residence that was currently receiving free gas. We held that the right to free gas passed under the deed provision conveying all privileges and appurtenances to the parcel.

**{¶79}** Chuck Dye testified that the original residence to which free domestic gas was provided was demolished, although he could not remember whether the Jacobses or their predecessor-in-interest demolished the residence. It is undisputed that Appellants own the only residence on the Leased Premises. Because the phrase "free gas for one house" does not designate a specific lessee or a specific house on the leasehold, and Appellants own the only residence on the leasehold interest, we find that Appellants have a contractual right to free gas, subject to the fulfillment of the reasonable administrative requests made by the Dyes.

**{¶80}** In summary, we find that Appellants had a good faith obligation to comply with Appellees' administrative requirement prior to the payment of royalties and provision of free domestic gas. Therefore, the trial court did not err in entering judgment in favor of Appellees on Appellants' breach of contract claims, and Appellants' fourth assignment of error is meritless.

## ASSIGNMENT OF ERROR NO. 5

**BECAUSE THE LEASE EXPIRED AND/OR TERMINATED AS LATE AS 2004, THE TRIAL COURT ERRED IN FAILING TO FIND THAT APPELLEES CONVERTED APPELLANTS' OIL AND GAS FROM 2014 FORWARD.**

## ASSIGNMENT OF ERROR NO. 6

**BECAUSE THE LEASE EXPIRED AND/OR TERMINATED AS LATE AS 2004, THE TRIAL COURT ERRED IN FAILING TO FIND THAT APPELLEES DID NOT [SIC] TRESPASS ON APPELLANTS' PROPERTY.**

**{¶81}** Having concluded that the trial court did not err in entering judgment as a matter of law on Appellants' forfeiture claims, we find that Appellants' tort claims, predicated upon alleged expiration of the Lease, were properly dismissed by the trial court. Accordingly, Appellants' fifth and sixth assignments of error are not well-taken.

## ASSIGNMENT OF ERROR NO. 7

**BECAUSE THE LESSEE DRILLED ONE WELL IN THE EARLY 1980s AND DID NO FURTHER DEVELOPMENT THEREAFTER, THE TRIAL COURT ERRED BY FAILING TO HOLD THE LEASE WAS FORFEITED AS TO APPELLANTS' PROPERTY UNDER THE IMPLIED COVENANTS.**

**{¶82}** Oil and gas leases are ordinarily subject to an implied covenant to reasonably develop the land. *Alford v. Collins-McGregor Operating Co.*, 152 Ohio St.3d 303, 2018-Ohio-8, 95 N.E.3d 382 ¶ 12. The Ohio Supreme Court has recognized "an implied covenant on part of the lessee that he will drill and operate such number of oil wells on the lands as would be ordinarily required for the production of oil contained in such lands, and afford ordinary protection to the lines." *Harris, supra*, at paragraph one of the syllabus. The parties can prevent application of the implied covenant of reasonable development by including express provisions to the contrary in the lease. *Beer, supra*, paragraph two of the syllabus.

**{¶83}** Here, the Lease does not contain a disclaimer of implied covenants, nor does it otherwise address whether a specific number of wells must be drilled or the depth to which the wells must be drilled. Where a lease fails to contain any specific reference to the timeliness of development, the law will infer a duty to operate with reasonable

diligence. *Harris,* 57 Ohio St. at 127, 48 N.E. 502, *see also Ionno v. Glen–Gery Corp.,* 2 Ohio St.3d 131, 133, 443 N.E.2d 504 (1983).

**{¶84}** The purpose of the implied covenant of reasonable development is to protect the lessor's interest in the lease, which is to obtain production and profits once the right to drill has been granted to the lessee. *Alford, supra,* ¶ 18, citing Summers Oil and Gas, Section 17:10 (3d Ed.2008). This protection is necessary because oil and gas leases typically provide that the lessor's compensation is a royalty payment based on the production of oil from the land. *Id.*

**{¶85}** Because lessees face various risks in any oil and gas lease, including substantial upfront investments with an uncertain potential for returns, the Ohio Supreme Court has held that the covenant imposes on the lessee the obligation to act as a reasonably prudent operator would as it develops the land under the lease. *Harris*, 57 Ohio St. at 127, 48 N.E. 502 ("The development and protection of lines which is thus implied when the lease is silent is such as is usually found in the same business of an ordinarily prudent man – neither the highest nor lowest, but about medium or average").

**{¶86}** Whether the lessee has breached the implied covenant of reasonable development is determined by the facts and circumstances of each particular case. *Alford* at ¶ 13, citing Summers Oil and Gas, Section 17:15. Forfeiture of an oil and gas lease may be an appropriate remedy, under limited circumstances, for a breach of an implied covenant. *Hoop v. Kimble*, 7th Dist. Harrison No. 14 HA 9, 2015-Ohio-2110, 2015 WL 3489020, ¶ 15.

**{¶87}** Appellants have offered no evidence in support of their breach of implied covenant claim. They simply advance the circular argument that "[i]f there is no oil and gas under the additional acres not currently exploited by the Adams Well why are the Dyes refusing to release the acreage and contesting this action?" (Appellants' Brf., 33). Appellants further argue that Appellees have breached the implied covenant of reasonable care and due diligence based on a photograph of the Well. However, they have not explained how the photograph demonstrates a violation of reasonable care and due diligence.

**{¶88}** Appellants cite *Beer, supra,* for the proposition that forfeiture is the appropriate remedy. The oil and gas company in that case was in receivership, and had

Case No. 18 MO 0020

roughly 25 judgments filed against it, so the Ohio Supreme Court concluded that a damage award would be inadequate with respect to the wells, which would require further efforts to be productive, and also with respect to all unexploited acreage. Forfeiture of the lessee's interest was warranted in *Beer* to assure the development of the land and the protection of lessor's interests. The same is not true here.

**{¶89}** Chuck Dye averred that Walter and Janet Dye elected not to drill any additional wells on the USA property because of the complicated and costly nature of obtaining a permit. (Chuck Dye Aff. ¶ 19). Because we have found that the Lease has produced oil and gas in paying quantities over the course of the last fifteen years, and Appellants have offered mere speculation, rather than evidence, regarding potential production from unexploited acreage, we affirm the trial court's decision on the implied covenants in the Lease, and further find that Appellants' seventh assignment of error has no merit.

## CONCLUSION

**{¶90}** We hold today that a successor-lessor has a good faith obligation to notify the lessee of a change in ownership of the mineral interest, with supporting documentation, as well as a good faith obligation to comply with the lessee's reasonable administrative requests, as conditions precedent to the payment of royalties and free domestic gas in an oil and gas lease. Appellants in this case fulfilled the notice requirement on January 21, 2014, but never complied with the lessee's reasonable administrative requirements. As a consequence, the trial court did not err in dismissing Appellants' forfeiture and breach of contract claims based upon Appellees' failure to pay royalties and provide free domestic gas pursuant to the Lease.

**{¶91}** Further, the statute of limitations applicable to oil and gas leases completely forecloses Appellants' breach of contract claims based on the failure to drill a new well or to commence production in the primary term. In the alternative, Appellants have offered no evidence to establish a genuine issue of material fact with respect to those claims.

**{¶92}** Next, Appellants' production in paying quantities claim must fail as a matter of law because the evidence in the record establishes continuous production in paying quantities during the relevant limitations period, with the exception of 2006. Appellants

Case No. 18 MO 0020

have not offered any evidence to show that the Dyes' failure to maintain separate records for each well prevented them from establishing a lack of production in paying quantities for the Well at issue in this appeal. Accordingly, Appellants' conversion and trespass claims, which are predicated upon the alleged expiration of the Lease, must likewise fail. Finally, Appellants have not adduced any evidence to support their breach of implied covenants claim.

{¶93} Having reviewed the record in this case, we find that Appellants' assignments of error have no merit. Therefore, we affirm the entry of summary judgment by the trial court in favor of Appellees in its entirety.

Donofrio, J., concurs.

Robb, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is affirmed.  Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**