[Cite as *Zarlenga v. Zarlenga*, 2020-Ohio-6947.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MAHONING | ) | |

CARMINE R. ZARLENGA III, TRUSTEE, et al.

    Appellees

    v.

DANIEL J. ZARLENGA, TRUSTEE

    Appellant

C.A. No.    2019 MA 89

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MAHONING, OHIO
CASE No.    2018 CI 0003

DECISION AND JOURNAL ENTRY

Dated: December 24, 2020

TEODOSIO, Judge.

{¶1}    Defendant-Appellant, Daniel Zarlenga ("Daniel"), appeals from the judgment of the Mahoning County Court of Common Pleas, Probate Division, removing him as co-trustee and trust advisor of his father's trusts and ordering him to pay the trusts more than $2.8 million. This Court affirms.

I.

{¶2}    Daniel is the son of Carmine R. Zarlenga, Jr. ("Father"). Father and Daniel's grandfather established three companies during their lifetimes: The Acme Company ("Acme"), C-Z Trucking Company, Inc. ("C-Z Trucking"), and C-Z Construction and Development Company ("C-Z Construction"). Father eventually took control of all three companies as both president and majority shareholder. He also married and had seven children. As he grew older and his health declined, he sought to ensure that his companies would remain family owned and operated

businesses.  He also sought to ensure that his wife, Martha Zarlenga ("Mother"), would be provided for if he predeceased her.

{¶3}     Father's desire to protect the companies, minimize his potential estate tax liabilities, and provide for Mother resulted in him constructing a comprehensive estate plan in 1995.  He called upon two of his sons, Daniel and Carmine R. Zarlenga, III ("Carmine"), to help carry out his plan.  Father established irrevocable trusts for Daniel and Carmine and executed a buy/sell agreement between himself, Acme, C-Z Trucking, and his son's trusts.  Around the same time, Daniel and Carmine executed the Zarlenga Family Partnership Agreement ("the Partnership"), which was an agreement between their respective trusts.  The buy/sell agreement and the Partnership incorporated one another and placed restrictions on the sale and purchase of Father's shares in the family companies, as well as the eventual sale of any shares owned by Daniel or Carmine.  The documents also provided that the Partnership would serve as the beneficiary of Father's and Mother's life insurance policies.  Both documents indicated that the insurance was "intended to be in an amount sufficient to provide the funds necessary to purchase [Father's] shares of stock in the [family companies]."  After the foregoing documents were executed, Father executed his will and a declaration of trust.

{¶4}     Father bequeathed his tangible personal property and interest in his residential real estate to Mother and bequeathed the remainder of his estate to his trust.  Upon his death, his trust provided for the creation of both a Marital Deduction Trust ("the Marital Trust") and a Family Trust ("the Family Trust").  A designated fraction of his estate would fund the Marital Trust, and the remainder would fund the Family Trust.  Mother would receive an income from both trusts on an installment basis and their principals would remain intact unless needed "for her health, support and maintenance."  A restrictive covenant in the Family Trust further provided that its principal

could not be distributed for Mother's care until the funds in the Marital Trust had been exhausted. Upon Mother's death, the residue of Father's trust would be divided equally among their seven children.

{¶5} Father designated Daniel and Carmine co-trustees of his trust. He also designated Daniel trust advisor "for the purpose of approving of all trust investments, sales and purchases" and for "vot[ing] all shares of any closely-held corporation stock, other than that of [C-Z Construction], held in the Trust." When Father died in 2003, his controlling interest in each of the family companies transferred to his trust. Daniel became president of each company and owned approximately 20% of their shares, but the trust held the remaining 80%. Father's trust also had limited liquidity because a significant portion of its assets were Father's shares in the companies. Father's original estate plan called for those shares to be held by the trust until Mother died. At that point, the shares could be purchased by the surviving shareholder(s).

{¶6} In 2005, Daniel and Carmine decided to expedite the sale of stock in the companies that was set to occur upon Mother's death. They planned for each company to purchase its stock from the Marital Trust and/or Family Trust. Their plan meant that Daniel would essentially be able to control 100% of the stock (i.e., by owning 20% and running the companies that owned 80%) and the trusts would increase their liquidity to better provide for Mother during her lifetime. To execute their plan, the companies and the trusts entered into a series of agreements:

- Acme signed a promissory note with the Family Trust, as well as a stock redemption agreement and stock pledge agreement. Acme agreed to pay the Family Trust $132,561, plus 6% interest, over 120 monthly installments to purchase its stock and pledged stock certificates as security for its payment obligation.

- Acme signed a promissory note with the Marital Trust, as well as a stock redemption agreement and stock pledge agreement. Acme agreed to pay the Marital Trust $252,315, plus 6% interest, over 120 monthly installments to purchase of its stock and pledged stock certificates as security for its payment obligation.

- C-Z Trucking signed a promissory note with the Marital Trust, as well as a stock redemption agreement. C-Z Trucking agreed to pay the Marital Trust $128,506, plus 6% interest, over 120 monthly installments to purchase its stock.

- C-Z Construction signed a promissory note with the Family Trust, as well as a stock redemption agreement. C-Z Construction agreed to pay the Family Trust $926,618, plus 6% interest, over 120 monthly installments to purchase its stock.

As part of their respective agreements, each company tendered a down payment on the purchase of its stock. The down payments were in addition to the amounts each company promised to pay by way of promissory note.

{¶7} Although all three companies promised to make installment payments to the trusts on their respective promissory notes, they did not follow through on their obligations. C-Z Construction failed to make a single payment on its note, Acme stopped paying on its notes by 2008, and C-Z Trucking stopped paying on its note in 2009. Each of the promissory notes contained default provisions, but neither Daniel, nor Carmine invoked those provisions when the companies failed to pay. Daniel informed Carmine that the companies were struggling financially, and neither brother wanted to see them to fail. It was Carmine's understanding that the companies would resume (or, in the case of C-Z Construction, begin) paying on the notes when they were

financially able to do so. Moreover, he believed the Partnership would eventually be able to use Mother's life insurance proceeds to help pay off the notes.

{¶8} While both Carmine and Daniel enjoyed the title of co-trustee, Daniel possessed certain information that Carmine lacked. Carmine was a partner in a large law firm, lived out-of-state, and only visited about twice a year. Because he was not involved in the family business, he lacked the financial insight Daniel enjoyed as both the president of all three companies and their controlling shareholder. Carmine also had far less contact with Mother than Daniel. Daniel and his family moved in with Mother when Father died. He, therefore, saw her regularly, had access to her financials, and was the one who counseled her regarding any important decisions. For years, Carmine essentially accepted Daniel's representations about the financial status of the companies and had limited involvement with Mother's financials or the Marital Trust and Family Trust.

{¶9} Sometime during the last half of 2015, Carmine received a credit card offer from the same bank that handled the Marital Trust. He created an individual account with the bank and, when he did so, the bank automatically provided him with online access to the Marital Trust account as co-trustee. Carmine then surveyed the Marital Trust account and observed a great number of distributions of which he previously had not been aware. His observations caused him to worry that Daniel had been making trust distributions of his own accord and misusing the trust assets. To confirm his suspicions and identify the extent of the misuse, Carmine hired a forensic accounting firm to investigate.

{¶10} Mother died while the accounting investigation was still underway. Though her life insurance proceeds were paid to the Partnership, they were not used to compensate the Marital Trust or the Family Trust for the sale of Father's stock (i.e., by paying down the outstanding balances on the promissory notes). Instead, Daniel used the majority of the funds to issue checks

to the family companies.  He also used a portion of the funds to pay his rent on a condo in Florida and to make a significant down payment on a house he purchased in California.

{¶11}  The accounting investigation concluded in August 2017 and identified numerous issues, suggesting that Daniel had mishandled funds in the Marital Trust and Family Trust, as well as Mother's personal accounts.  A family meeting was held, excluding Daniel, and Carmine ultimately confronted Daniel with the information he and the forensic accounting firm had discovered.  Carmine demanded that Daniel join him in declaring the promissory notes in default.  He also demanded that Daniel resign as co-trustee and trust advisor.  Because Daniel refused to take any of the foregoing actions, the co-trustees deadlocked.  To resolve their impasse, Carmine sought judicial intervention.

{¶12}  Carmine filed suit against Daniel, seeking to remove him as co-trustee and trust advisor and to have him account for the funds held in trust.  He also moved for an interim order, pending final disposition, to remove Daniel as co-trustee and trust advisor.  Carmine alleged that Daniel had allowed the family companies to default on their monthly obligations to the trusts and had wrongfully disposed of trust funds.  He further alleged that Daniel had failed to initiate default proceedings against the family companies and had refused to join him in issuing notices of default, thereby creating a deadlock among the co-trustees.  Carmine maintained that Daniel had breached his duties of loyalty and impartiality by protecting his personal interests rather than honoring his obligations as co-trustee.  Apart from asking the court to remove Daniel as co-trustee and trust advisor and have him account for the trust funds, he asked that Daniel be ordered to reimburse the trust and/or him (Carmine) for any wrongfully disposed funds, the costs of the investigation and suit, and attorney fees.

{¶13}   Daniel answered the complaint, opposed the motion to remove him as co-trustee and trust advisor, and moved the court to join his remaining siblings to the suit as persons needed for a just adjudication.  It was his position that he had been forced to use personal and/or company funds to provide for Mother at numerous points and that any distributions he made from the trusts or the Partnership were in the nature of reimbursements for monies previously expended on her care, support, or maintenance.  Before the court responded to Daniel's motion for joinder, Carmine filed an amended complaint along with his and Daniel's five other siblings.  Two of those siblings settled with Daniel before trial and assigned him their interests in Father's trust.  Consequently, the suit proceeded with Carmine and three of his siblings as named plaintiffs and Daniel as the named defendant.

{¶14}   The trial court held a hearing on the motion to remove Daniel as co-trustee and trust advisor.  As a result of the hearing, the assets of the trust were frozen, and Daniel was ordered to prepare an accounting of the Martial Trust and the Family Trust and any payments he made from his personal account to benefit Mother.  Additionally, the court ordered him and Carmine to issue notices of default on the promissory notes so that the trust could prepare to collect sums owed on the notes from the family companies.  The court temporarily suspended Daniel as trust advisor and enjoined him from selling or disposing of any company assets without order of the court.

{¶15}   Daniel provided an accounting of the Family Trust and the Martial Trust, and the court scheduled the matter for a bench trial.  Following the trial, both parties submitted post-trial briefs, and the trial court issued its decision.  The court determined that Daniel had breached his fiduciary duties as co-trustee in several respects, by failing to administer the trust, failing to remain impartial and loyal to the trust, failing to enforce claims on behalf of the trust, and failing to keep the trust beneficiaries informed.   The court removed him as co-trustee and trust advisor.

Additionally, it ordered him to redress his breaches of trust by: (1) repaying the Marital Trust $140,000 for monies improperly distributed; (2) repaying the Family Trust $41,000 for monies improperly distributed; and (3) paying the Marital Trust $2,712,834 for the monies due and owing on the promissory notes he signed on behalf of the family companies. The court denied Carmine's request to have Daniel pay his reasonable attorney fees or the cost of the forensic accounting investigation.

{¶16} Daniel now appeals from the judgment of the trial court and raises six assignments of error for our review. Because several of his assignments of error are interrelated, we consolidate them for purposes of our decision. Further, for ease of analysis, we reorder several of the assignments of error.

II.

**ASSIGNMENT OF ERROR IV**

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REMOVED DANIEL ZARLENGA AS CO-TRUSTEE OF THE CARMINE R. ZARLENGA, JR. REVOCABLE LIVING TRUST.

**ASSIGNMENT OF ERROR V**

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT CONCLUDED THAT DANIEL ZARLENGA ACTED IN HIS OWN BEST INTERESTS BY NOT TAKING THE STEPS NECESSARY TO PROTECT AND COLLECT THE MONIES DUE TO THE TRUSTS ALL WHILE STILL ENJOYING THE USE AND BENEFITS THAT CAME FROM OWNING AND OPERATING THE BUSINESSES.

{¶17} In his fourth and fifth assignments of error, Daniel challenges the trial court's finding that he acted in his own best interest and its ultimate decision to remove him as co-trustee and trust advisor of Father's trust. For the following reasons, we reject his arguments.

{¶18} "Probate Courts have a wide discretion in the appointment and removal of trustees * * *." *In re Labold's Will*, 148 Ohio St. 332, 339 (1947). As such, appellate courts review a

probate court's decision to remove a trustee for an abuse of discretion. *See In re the Trust Created Under Item IV of the Last Will and Testament of Watson* ("*In re Watson*"), 7th Dist. Mahoning No. 03 MA 154, 2004-Ohio-7063, ¶ 19. *Accord Gorby v. Aberth*, 9th Dist. Summit No. 28021, 2017-Ohio-274, ¶ 31. An abuse of discretion means that the trial court's decision was arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). In applying the abuse of discretion standard, "[t]he appellate court cannot substitute its judgment for that of the trial court * * *." *Hanick v. Ferrara*, 7th Dist. Mahoning No. 19 MA 0074, 2020-Ohio-5019, ¶ 30.

{¶19} A court may remove a trustee for any "serious breach of trust" or because of any "unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively" if removal of the trustee would best serve the interests of the beneficiaries. R.C. 5807.06(B)(1), (3). Additionally, a court may remove a trustee if a "[l]ack of cooperation among co[-]trustees substantially impairs the administration of the trust * * *." R.C. 5807.06(B)(2). The removal of a trustee appointed by a will "'is a drastic action * * * [that] should be taken only where intervention is necessary to protect the [trust's] assets.'" *In re Watson* at ¶ 22, quoting *Manchester v. Cleveland Trust Co.*, 8168 N.E.2d 745, 752 (8th Dist.1960). Nevertheless, "[t]rustees must always act in good faith and always act fairly and reasonably, and a court of equity will and can require such [behavior]." *Tomazic v. Rapoport*, 8th Dist. Cuyahoga No. 97937, 2012-Ohio-4402, ¶ 23, quoting *In re Ternansky's Estate*, 141 N.E.2d 189, 192 (9th Dist.1957). Removal is appropriate if there exists clear and convincing evidence that it is required to protect the trust. *See In re Watson* at ¶ 20. *Accord Gorby* at ¶ 31.

{¶20} The trial court determined that Daniel breached several of his duties as co-trustee, including his duty of impartiality, his duty of loyalty, his duty to administer the trust in good faith

for the benefit of the beneficiaries, his duty to enforce claims on behalf of the trust, and his duty to keep the beneficiaries informed. Because Daniel was both a co-trustee and the president of the family companies, the court found that he was in a unique position to know whether the companies were financially able to abide by the terms of the notes and stock redemption agreements they signed with the Martial Trust and the Family Trust. The court determined that Daniel acted in his own best interest when he allowed the agreements to proceed and withheld information about the companies from Carmine, Mother, and his other siblings. Further, the court found that he acted in his own best interest when he allowed the companies to default on their agreements and simultaneously failed (and later refused) to issue them notices of default to begin collection proceedings.

{¶21} The court rejected any claim on Daniel's part that payments he made or approved to benefit Mother outside the terms of Father's trust ought to have been credited as payments on the notes. The court found that Father's trust explicitly set forth how the assets in the Martial Trust and the Family trust were to be used. Nevertheless, Daniel repeatedly used the funds for other purposes. Further, the court noted that Daniel never sought to execute any type of addendum, allowing the notes to be paid by other means. The beneficiaries, therefore, never had an opportunity to approve that arrangement. In fact, the court determined, the evidence showed that Mother and the other beneficiaries were oblivious to the manner in which the trusts were being administered, as Daniel never provided them with accountings or otherwise kept them informed. The court concluded that Daniel's numerous breaches of duty warranted his removal as co-trustee and trust advisor.

{¶22} Daniel argues that the trial court abused its discretion when it removed him as co-trustee and trust advisor because the record reflects that he always acted in Mother's best interest,

thereby substantially complying with his duties to the trust. He claims that he set forth substantial evidence, showing that he and the companies spent more than $1.2 million of their own money to benefit Mother. He also claims that there was no evidence Mother ever questioned his management of the trust, lacked for any necessities, or failed to receive income she was due. Because the sum he and the companies expended caring for Mother exceeded the debt due and owing on the promissory notes, Daniel argues, it was unreasonable for the court to conclude that he acted in his own best interest or breached his fiduciary duties.

{¶23} Daniel further argues that the trial court's decision was unreasonable, arbitrary, or unconscionable because it did not account for his recent actions or Carmine's failure to fulfill his own duties as co-trustee. As to his recent actions, he notes that he agreed to execute notices of default to commence collection proceedings against the family companies. Though his doing so effectively cured the deadlock between the two co-trustees, Daniel claims that his actions went unnoticed by the trial court in its decision. As to Carmine's failings, Daniel notes that Carmine approved the agreements between the family companies and the trusts and was aware that the family companies had stopped paying on the notes. He also notes that Carmine never provided any trust reports or actively managed the trust assets. According to Daniel, if he violated his duties to Father's trust, then Carmine violated those same duties by ratifying his actions and/or failing to independently administer the trust. He argues that the trial court lost its way when it blamed him for the state of the trust and ignored Carmine's failings.

{¶24} Carmine testified that, of his six siblings, Daniel was the only one who pursued a career with the family companies. After Father died and his stock transferred to his trust, it was Carmine's idea to expedite the sale of his stock to the companies. He testified that Daniel was "very interested" in that idea because he "felt like he had money[ and] the companies were doing

well * * *." Accordingly, the stock was valued and, under Daniel's direction, Acme, C-Z Trucking, and C-Z construction entered into several agreements with the Marital Trust and/or Family Trust for the purpose of purchasing Father's stock.

{¶25} Carmine testified that, around 2009 or 2010, Daniel spoke to him about the family companies struggling financially due to the recession. Carmine agreed that the companies should suspend payment on the notes because he knew it was Father's wish that they survive. He testified that he came to town at least twice a year and would speak to Daniel each time about the businesses. According to Carmine, Daniel always told him the companies were doing poorly and it was not possible for them to resume payment without causing "extreme financial hardship[.]" Carmine indicated that he disliked leaving the notes unpaid, but was comforted by the fact that Mother's life insurance could eventually be used to satisfy the notes. He described the insurance as a "backstop" that had always been earmarked "to purchase the stock from the trusts so that the beneficiaries * * * would get compensation or some value for the stock * * *."

{¶26} Carmine testified that, until he discovered otherwise, he believed only small disbursements were being made from the Marital Trust and the Family Trust. Those disbursements related to Mother's income payments and other small expenses such as tax return preparation. Carmine described "being horrified" when he examined the Marital Trust account sometime in 2015 and saw that many large disbursements had issued from the account. He testified that those disbursements had been made without his knowledge, and he recognized Daniel's signature on the checks that had been written.

{¶27} A certified fraud examiner from the company Carmine hired to conduct a forensic accounting investigation testified about the results of the investigation. He testified that, including accrued interest, the family companies owed a total of $2,712,834 on the promissory notes they

signed with the trusts. Although the trusts were owed significant sums and their assets were only to be used for Mother's support or maintenance, the investigation revealed that several disbursements had been made to Acme from the Martial Trust. Specifically, the investigation revealed (1) a check written to Acme in 2008 for $45,000; (2) a check written to Acme in 2009 for $75,000; and (3) a check written to Acme in 2011 for $20,000. The investigation also uncovered numerous points of concern with respect to Mother's personal accounts.

{¶28} The examiner testified that Mother had a personal account at Farmers Bank as well as a checking and savings account at Chase Bank. In 2015, someone withdrew more than $17,000 from her Farmers Bank account at the bank counter. Because the withdrawal was made at the counter, no payee was identified. Even so, the examiner was unable to locate a deposit in that amount in any of Mother's other accounts. Beginning in 2008, Mother's Chase Bank accounts reflected regular payments to Chase Finance. The examiner confirmed that there was no evidence Mother had any long-term obligation with Chase Finance. Further, he testified, there was evidence Daniel had written numerous checks from Mother's Chase Bank account between 2008 and 2012. Those checks were for items such as a tuition payment to Youngstown State University, multiple payments to Acme and an affiliated company, multiple payments to the United States Treasury on behalf of Daniel and his children, and a condo association fee payment in the amount of almost $4,000. Daniel later confirmed that the condo belonged to him.

{¶29} The examiner noted that Mother received a salary from Acme, but that her salary had remained relatively consistent from the time the promissory notes had been signed (i.e., 2005) until her death. Accordingly, Mother did not receive more money after the family companies stopped paying on their notes. Further, while Mother was being paid a salary by Acme, checks back to Acme were routinely being issued from her personal account. The examiner also testified

that her bank records showed her taxes being paid from her personal accounts instead of the trusts. The examiner confirmed that Mother incurred a larger tax penalty as a result of receiving wages from Acme rather than larger trust payments.

{¶30} Carmine testified that he held a family meeting after he received the results of the accounting investigation. He then contacted Daniel and demanded that he agree to declare the promissory notes in default and/or resign as co-trustee. Carmine testified that Daniel refused to do so and essentially "stonewall[ed]" him when he asked about the irregularities the accounting investigation had identified. Additionally, Daniel refused to provide him with information about the life insurance proceeds that were paid to the Partnership when Mother died. Carmine fervently denied that he ever agreed the insurance proceeds could be used to support the family companies. He testified that the insurance money had always been earmarked to compensate the trusts for the purchase of Father's stock. Nevertheless, he discovered that Daniel had used that money, without his knowledge, to loan more than $1.3 million to the companies. Carmine indicated that he did not even understand how the funds had been withdrawn from the Partnership account without his approval.

{¶31} The controller/bookkeeper for the family companies testified that they began struggling around 2008 and were in poor financial condition. He described how they had difficulty obtaining financing and how suppliers refused to extend them credit. He also testified that he was unfamiliar with the Martial Trust and Family Trust. In fact, up until Carmine filed suit, he was unaware that the companies had any obligations to the trusts.

{¶32} The vice president of the family companies, who was also Daniel's son, agreed that Daniel "call[ed] the shots" at the companies and decided which bills to pay. At trial, Carmine and the other plaintiffs produced a copy of an email that the vice president sent to Daniel about his

spending habits. The vice president shared the email with Carmine in the wake of the family meeting. In the email, the vice president outlined how Daniel's spending habits were "off the charts" and financially ruining Acme. He accused Daniel of using the company "as [his] own personal piggy bank" to the detriment of its employees and business model. Finally, he demanded that Daniel either retire or agree to a series of demands, including shared control of the finances and prior authorization for any expenditures.

{¶33} At numerous points during the trial, Carmine and the other plaintiffs set forth more detailed evidence about expenditures Daniel made while he served as co-trustee. There was evidence that he expended more than $100,000[1] for home improvements to Mother's home after he and his family moved in, which included the addition of an attached three-car garage. There also was evidence that either the Marital Trust or Mother's personal accounts were used to issue almost $275,000 in college tuition payments for Daniel's children, as well as a few of the other grandchildren. There was evidence that, multiple times, Daniel used the life insurance money from the Partnership to pay rent on his condo in Florida. Moreover, there was evidence that he used more than $326,000 of that money for a down payment on a house he purchased in California.

{¶34} When Daniel testified, it was essentially his position that he and/or the family companies had satisfied their respective obligations to the trusts by taking care of Mother and expending their own money on her behalf. He noted that, between the time Father died and the time the promissory notes were executed, Father's trust had few liquid assets. He estimated that he spent about $160,000 of his own money supporting Mother during that time. He further estimated that, between the time the promissory notes were executed and Mother's death, she had

---

[1] It is not clear from the record whether Daniel used company funds, funds from the trusts, funds from Mother's personal accounts, or some combination of those funds to pay for the home improvements.

almost $1.26 million in expenses. Though the family companies stopped paying directly on their notes, Daniel claimed that he and the companies eventually paid even more than the amounts due on the notes caring for Mother. He explained that the three-car garage he had installed at her home was for her benefit, so that she could park inside and not have to worry about hitting the sides of the garage. He further explained that he made college tuition payments for her grandchildren at her direction, as she and Father always wished to be able to provide the children with an education. To the extent the trusts or Mother's personal accounts were used to make payments to Acme, Daniel indicated that those payments were to reimburse the company for money expended on Mother. Likewise, it was his understanding that his parents intended their insurance proceeds be used to reimburse the person or entity who purchased Father's stock, not to fund the trust. Daniel maintained that the funds he transferred from the Partnership and/or trusts were used either directly for Mother's benefit or to reimburse himself or the companies for monies they expended for her benefit.

**{¶35}** To the extent Daniel challenges the trial court's finding that he acted in his own best interest, we must conclude that the record contains competent, credible evidence in support of its finding. *See Eddy v. Eddy*, 7th Dist. Mahoning No. 19 MA 0094, 2020-Ohio-5020, ¶ 26 ("A trial court's findings of fact must be given due deference if supported by competent, credible evidence."). Carmine and the other plaintiffs produced significant evidence that Daniel routinely took money from the trusts, Mother's personal accounts, and the Partnership to fund either the family companies or his lifestyle. At the same time, the family companies were significantly indebted to the trusts. Daniel sanctioned the arrangement between the companies and the trusts to gain control of Father's remaining shares, despite having knowledge that it would be difficult, if not impossible, for the companies to honor their debts. Moreover, when the companies did default,

he refused to hold them accountable. Because the record contains ample evidence in support of the trial court's finding that Daniel acted in his own best interest, we reject his argument that the court erred in reaching that determination. *See id.*

{¶36} We likewise reject Daniel's argument that the trial court abused its discretion when it removed him as co-trustee and trust advisor. *See In re Watson*, 2004-Ohio-7063, at ¶ 19. Father's trust and the buy/sell agreement expressly set out the manner in which funds from the Martial Trust, the Family Trust, and the Partnership were to be used. Despite those express terms, Daniel routinely expended funds for reasons other than Mother's "health, support and maintenance." He also failed to ensure that her life insurance proceeds were used "to purchase [Father's] shares of stock in the [family companies]" (i.e., by paying down the obligations on the promissory notes). Though Daniel claimed to have expended more money on Mother than was due on the promissory notes, neither Mother, nor any of the other beneficiaries ever agreed those expenditures would serve as credits to the trusts. In fact, Carmine recalled "being horrified" when he discovered how many expenditures Daniel had made. The trial court also was in the best position to judge Daniel's credibility on that point and reasonably could have determined that many of the expenditures he made were for his own benefit rather than Mother's. *See Delp v. Delp*, 6th Dist. Lucas No. L-16-1242, 2017-Ohio-7774, ¶27.

{¶37} As previously noted, a trial court may remove a trustee for a number of reasons, including any "serious breach of trust." R.C. 5807.06(B)(1). "[A] serious breach can consist of a single act which causes significant harm or involves flagrant misconduct, or a serious breach can consist of a series of smaller acts which, while not individually justifying a trustee's removal when standing alone, when viewed collectively warrant removal." *Nichols v. Bixler*, 5th Dist. Stark No. 2017CA00152, 2018-Ohio-3234, ¶ 19, citing *Kidd v. Alfano*, 2d Dist. Montgomery No. 26598,

2016-Ohio-7519, ¶ 37. The record supports the trial court's conclusion that Daniel routinely acted in his own best interest to the detriment of Father's trust. Even if none of his individual acts amounted to a serious breach of trust, the court reasonably could have concluded that his actions, when viewed collectively, warranted his removal. *See id.*, citing *Kidd* at ¶ 37.

{¶38} To the extent the trial court failed to discuss Carmine's alleged failure to fulfill his fiduciary duties, the court did not have before it a motion to remove Carmine as co-trustee. The only question before the court was whether Daniel ought to be removed. Moreover, Daniel has not explained why any breach of duty on the part of Carmine would have absolved him of the breaches he committed. *See* App.R. 16(A)(7). Carmine's actions notwithstanding, Daniel had an independent duty to act in good faith and to act fairly and reasonably on behalf of the trust. *See Tomazic*, 2012-Ohio-4402, at ¶ 23, quoting *In re Ternansky's Estate*, 141 N.E.2d at 192. The trial court reasonably determined that he breached his duties. Even if Daniel eventually agreed to issue notices of default to the family companies, he did not do so until trial. By then, significant assets held by either the trusts or the Partnership had been depleted. Upon review, we cannot conclude that the trial court abused its discretion when it removed Daniel as co-trustee and trust advisor. Accordingly, Daniel's fourth and fifth assignments of error are overruled.

## ASSIGNMENT OF ERROR II

> THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT RULED THAT THE STATUTE OF LIMITATIONS DID NOT APPLY BECAUSE DANIEL ZARLENGA CAUSED THE SITUATION OF NON-PAYMENT AND SHOULD NOT BENEFIT FROM IT.

{¶39} In his second assignment of error, Daniel argues that the trial court erred when it failed to conclude that any claims against him for breach of fiduciary duty were subject to a four-year statute of limitations. Because Carmine knew payments on the promissory notes had stopped

by 2009, but waited until 2018 to file suit, Daniel argues that the entire action against him was time-barred. For the following reasons, we reject his assignment of error.

{¶40} "It is a general rule that an appellate court will not consider any error which [an aggrieved litigant] * * * could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court * * *." *City of Youngstown v. Peavy*, 7th Dist. Mahoning No. 83 C.A. 37, 1984 WL 6528, *2 (Jan. 27, 1984). "A failure to preserve an issue in the trial court waives the issue for purposes of appeal." *Mauldin v. Youngstown Water, Dept.*, 7th Dist. Mahoning No. 19 MA 0010, 2019-Ohio-5065, ¶ 11. "There is no second chance to raise arguments on appeal that should have been raised before the trial court." *Jacobs v. Dye Oil, LLC*, 7th Dist. Monroe No. 18 MO 0020, 2019-Ohio-4085, ¶ 57. *See also Taylor v. Belmont Community Hosp.*, 7th Dist. Belmont No. 09 BE 30, 2010-Ohio-3986, ¶ 32-33.

{¶41} In the lower court, Daniel argued that this action was barred by the six-year statute of limitations contained in R.C. 1303.16. *See* R.C. 1303.16 (containing statute of limitations for actions on promissory notes). He also argued that Carmine waived his right to enforce the notes or his suit was barred by the doctrine of laches. At no point did Daniel argue that the action was barred by a different statute of limitations.

{¶42} On appeal, Daniel now claims that Carmine's suit was subject to a four-year statute of limitations. He relies on *Cundall v. U.S. Bank*, 122 Ohio St.3d 188, 2009-Ohio-2523, wherein the Ohio Supreme Court held that a four-year statute of limitations applied to fraud and breach of fiduciary duty claims brought by the beneficiaries of a constructive trust. Daniel never cited to *Cundall* in the lower court or claimed that R.C. 2305.09 applied. *See* R.C. 2305.09 (setting forth a four-year statute of limitations for certain torts, including fraud). Nor has he addressed the

application of R.C. 5810.10,[2] which outlines the time periods within which a beneficiary must commence a proceeding against a trustee for breach of trust. *See* R.C. 5810.05 (providing for a two-year statute of limitations in certain instances and a four-year statute of limitations in other instances).

{¶43} This Court will not consider Daniel's argument that Carmine's suit was subject to a four-year statute of limitations. That is because he waived his argument by failing to raise it in the lower court. *Mauldin*, 2019-Ohio-5065, at ¶ 11. The trial court never had the opportunity to consider the application of a four-year statute of limitations, and this Court will not decide the matter for the first time on appeal. *Jacobs*, 2019-Ohio-4085, at ¶ 57. *See also Taylor*, 2010-Ohio-3986, at ¶ 32-33. Accordingly, Daniel's second assignment of error is overruled.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT RENDERED JUDGMENT AGAINST DANIEL ZARLENGA PERSONALLY FOR UNPAID AMOUNTS DUE ON THE PROMISSORY NOTES EXECUTED BY THE FAMILY COMPANIES.

{¶44} In his first assignment of error, Daniel argues that the trial court erred when it ordered him to repay the amounts due on each of the promissory notes. Because the notes were executed by the family companies rather than by him as an individual, Daniel argues, he was not personally liable on the notes. He further argues that the court's judgment is invalid because the statute of limitations on each of the notes expired before Carmine filed suit. This Court rejects his arguments.

---

[2] Daniel's reply brief contains a brief reference to R.C. 5810.05(C). Yet, "a reply brief is not the proper place for assigning a new error or raising a new reason for reversing a judgment * * *." *Oxford Mining Co., LLC v. Ohio Gathering Co., LLC*, 7th Dist. Belmont No. 19 BE 0016, 2020-Ohio-1363, ¶ 73.

{¶45} "The probate court has plenary power at law and in equity to dispose fully of any matter that is properly before the court, unless the power is expressly otherwise limited or denied by a section of the Revised Code." R.C. 2101.24(C). R.C. 5810.01(B)(3) expressly allows a probate court to "[c]ompel [a] trustee to redress a breach of trust by paying money, restoring property, or other means * * *." Further, the Revised Code provides that

> [a] trustee who commits a breach of trust is liable to the beneficiaries affected for the greater of the following:
>
> (1) The amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred;
>
> (2) The profit the trustee made by reason of the breach.

R.C. 5810.02(A)(1), (2). A probate court's decision "relative to an assessment of damages" is a discretionary one that a reviewing court will uphold absent an abuse of discretion. *In re Estate of Pizzoferrato*, 190 Ohio App.3d 123, 2010-Ohio-4848, ¶ 37 (7th Dist.).

{¶46} Daniel's argument that he cannot be held personally responsible for payments due on the promissory notes consists of a single paragraph. He has failed to cite to any law or offer any reasoned analysis, demonstrating that the probate court erred when it ordered him to pay the amounts due on the notes. *See* App.R. 16(A)(7). The Revised Code expressly allows probate courts to compel trustees to redress breaches of trust and restore trust assets impaired by their breaches. *See* R.C. 5810.01(B)(3) and 5810.02(A)(1), (2). Absent any meaningful argument from Daniel, this Court will not conclude that the trial court lacked the ability to render judgment against him for the same amount due on the notes. *See* App.R. 16(A)(7); *Vari v. Coppola*, 7th Dist. Mahoning No. 18 MA 0114, 2019-Ohio-3475, ¶ 8-10.

{¶47} To the extent Daniel argues that the statute of limitations on each note has expired, he relies on R.C. 1303.16. That statute sets forth the six-year statute of limitations that applies to actions to enforce a negotiable instrument (e.g., a breach of contract suit). *See* R.C. 1303.16. *See*

*also Hudson & Keyse, LLC. v. Yarnevic-Rudolph*, 7th Dist. Jefferson No. 09 JE 4, 2010-Ohio-5938, ¶ 25.  Yet, Carmine and his siblings did not file suit against Daniel to enforce a negotiable instrument.  Their suit asked the probate court to determine whether Daniel breached his fiduciaries duties, whether he ought to be removed as co-trustee and trust advisor, and whether he should be compelled to redress his breaches of trust by repaying certain monies due to the trusts.  Daniel has not attempted to explain why their suit was subject to the six-year statute of limitations set forth in R.C. 1303.16.  *See* App.R. 16(A)(7); *Vari* at ¶ 8-10.  As such, we reject his argument that the trial court erred when it failed to apply that statute.  Daniel's first assignment of error is overruled.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FAILED TO APPLY PAYMENTS MADE BY DANIEL ZARLENGA TO THE PROMISSORY NOTES AT ISSUE.

{¶48}  In his third assignment of error, Daniel argues that the trial court erred when it refused to apply payments he made on behalf of Mother as credits toward the balances due on the promissory notes.  We do not agree.

{¶49}  As previously noted, a probate court's decision "relative to an assessment of damages" is a discretionary one that a reviewing court will uphold absent an abuse of discretion. *In re Estate of Pizzoferrato*, 2010-Ohio-4848, at ¶ 37.  An abuse of discretion means that the trial court's decision was arbitrary, unconscionable, or unreasonable.  *Blakemore*, 5 Ohio St.3d at 219. In applying the abuse of discretion standard, "[t]he appellate court cannot substitute its judgment for that of the trial court * * *."  *Hanick*, 2020-Ohio-5019, at ¶ 30.

{¶50}  The trial court found that Daniel never secured the permission of the beneficiaries or legally effectuated any changes to the binding instruments herein to allow him to pay Mother outside the terms of the note, but receive credits on the notes for those payments.  The court found

that Father's trust and the agreements between the companies, the Marital Trust, and the Family Trust specified how money in the trusts was to be expended, what money was due the trusts, and how that money was to be paid. Even if Daniel believed he was acting in Mother's best interest, the court reasoned, his actions demonstrated that he routinely acted in his own best interest and failed to administer the trust in good faith for the benefit of all its beneficiaries. Thus, the court determined that Daniel was not entitled to credit for payments he allegedly made in Mother's best interest.

{¶51} Daniel argues that the court erred when it refused to apply payments he made on Mother's behalf toward the balance due on the promissory notes. Even if his actions technically violated the terms of Father's trust and/or the agreements between the companies and the trusts, Daniel argues, the "substance" of how he handled the funds was consistent with his fiduciary duties. He also claims that Carmine knew he was making payments on Mother's behalf in lieu of making payments on the notes and was satisfied with that arrangement. Finally, he notes that there was no language in Father's trust, requiring him to preserve trust assets for anyone other than Mother.

{¶52} Many of Daniel's arguments in support of this assignment of error mirror the arguments he raised in support of his fourth and fifth assignments of error. *See* Discussion, *supra*. In reviewing those assignments of error, this Court rejected the notion that Daniel substantively complied with the terms of Father's trust. We also rejected his arguments that he acted strictly in Mother's best interest and that Carmine ratified his actions. We determined that the trial court acted within its sound discretion when it decided that Daniel breached multiple fiduciary duties and removed him as co-trustee and trust advisor. In addressing this assignment of error, we incorporate and bear in mind our prior discussion, determinations, and conclusions. *See id.*

{¶53} Upon review, we cannot conclude that the trial court abused its discretion when it refused to apply payments Daniel allegedly made on behalf of Mother as credits toward the balances due on the promissory notes. *See In re Estate of Pizzoferrato*, 2010-Ohio-4848, at ¶ 37. The trial court reasonably could have determined that many of the expenditures Daniel made were for his own benefit rather than Mother's. *See* Discussion, *supra*. Further, while Carmine was aware that the family companies had stopped paying on their notes, he specifically testified that the intention was always for those payments to resume at some point. It was not his understanding that future payments were unnecessary because those payment obligations were otherwise being satisfied. Moreover, there was no evidence that Mother or the other siblings ever agreed to that arrangement. Father's trust and the buy/sell agreement expressly set out the manner in which funds from the Martial Trust, the Family Trust, and the Partnership were to be used. Despite those express terms, Daniel routinely expended funds for reasons other than Mother's "health, support and maintenance." He also failed to ensure that her life insurance proceeds were used "to purchase [Father's] shares of stock in the [family companies]" (i.e., by paying down the obligations on the promissory notes). The trial court, therefore, reasonably could have determined that he was liable for the full "amount required to restore the value of the trust property and trust distributions to what they would have been had [his] breach[es] not occurred * * *." R.C. 5810.02(A)(1). His third assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE IT EITHER DID NOT HAVE JURISDICTION OR EXCEEDED ITS OWN JURISDICTION BY GRANTING A JUDGMENT THAT EXCEEDED THE PRAYED-FOR RELIEF CONTAINED IN THE MOTION TO REMOVE CO-TRUSTEE AND TRUST ADVISOR FILED JANUARY 22, 2018 AND THE COMPLAINT FOR REMOVAL OF TRUSTEE AND ACCOUNTING ALSO FILED ON JANUARY 22, 2018.

{¶54} In his sixth assignment of error, Daniel argues that the trial court erred as a matter of law when it ordered him to repay the Marital Trust more than $2.7 million (i.e., the amount due and owing on the promissory notes with accrued interest). According to Daniel, the court's judgment in that respect exceeded the scope of relief prayed for by Carmine and his siblings. He argues that the family companies owed the debts on the promissory notes, not him as an individual, and the family companies were never named in either the complaint or motion to remove him as co-trustee and trust advisor. We reject his argument.

{¶55} The record reflects that Carmine and his siblings specifically included in their demand for judgment an order that Daniel "redress *any* breach of trust by reimbursing the Marital Trust and/or the Family Trust for *all* sums wrongfully disposed * * *." (Emphasis added.) As previously noted, a probate court has "plenary power at law and in equity to dispose fully of any matter that is properly before [it] * * *." R.C. 2101.24(C). Once the court determined that Daniel breached his fiduciary duties, it was statutorily authorized to compel him to redress his breaches of trust and restore any trust assets impaired by his breaches. *See* R.C. 5810.01(B)(3) and 5810.02(A)(1), (2). Because Daniel essentially prevented the trusts from collecting on the promissory notes, first by stopping payment as president of the family companies and later by refusing to enforce the notes as co-trustee, we cannot conclude that the trial court erred or exceeded the scope of prayed-for relief when it ordered him to pay the amount due and owing on the notes, plus accrued interest.

{¶56} Daniel also has included in his reply brief an argument that his obligation to the trusts should be reduced by 3/7. That is because two of his siblings settled with him before trial and assigned him their interest in Father's trust. Daniel argues that he should not be responsible for repaying trust assets that will be distributed to him and the two siblings who assigned him their

interest. We need not address the merits of his argument, however, as "a reply brief is not the proper place for assigning a new error or raising a new reason for reversing a judgment * * *." *Oxford Mining Co., LLC v. Ohio Gathering Co., LLC*, 7th Dist. Belmont No. 19 BE 0016, 2020-Ohio-1363, ¶ 73. Daniel's sixth assignment of error is overruled.

## III.

**{¶57}** Daniel's assignments of error are overruled. The judgment of the Mahoning County Court of Common Pleas, Probate Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Mahoning, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL, P. J.
JULIE A. SCHAFER, J.
CONCUR.

(Hensal, P. J., Teodosio, J., and Schafer, J., of the Ninth District Court of Appeals, sitting by assignment.)

APPEARANCES:

RICHARD L. GOODMAN, Attorney at Law, for Appellant.

WILLIAM M. FLEVARES, Attorney at Law, for Appellant.

DAVID S. BARBEE, Attorney at Law, for Appellees.